**Barbara E. GREER, Respondent,**

v.

**CONTINENTAL GAMING COMPANY, R & R Kehl, Inc., Greater Rings Island Gaming Company, Mignon Enterprises, Inc., Appellants.**

No. WD 55937.

Missouri Court of Appeals, Western District.

Sept. 14, 1999.

Rehearing Denied Nov. 2, 1999.

Application to Transfer Denied Dec. 21, 1999.

James Wm. Herron, St. Louis, William Meyer, Kansas City, for Appellants.

Mirko Bolanovich, II, Kansas City, for Respondent.

FOREST W. HANNA, Judge.

The plaintiff, Barbara Greer, filed a personal injury suit against the defendants under the Jones Act, 46 U.S.C.App. § 688, *et seq.* To be covered by the Jones Act, a claimant must prove that she was injured "in the course of her employment" as a "member of a crew of any vessel." 33 U.S.C. § 902(3)(G). The first prong of the statute is not contested. Mrs. Greer was injured "in the course of her employment." After a jury trial, the trial court entered

judgment in favor of Mrs. Greer in the amount of $500,000 plus post-judgment interest and costs. The defendants' first complaint on appeal is that the trial court erred in determining, as a matter of law, that the St. Jo Frontier Casino was "a vessel in navigation" at the time of Mrs. Greer's injuries. The defendants also complain that the trial court erred in permitting John Ward, an expert economist, to testify regarding his calculations of the total value of future lost wages and household services. Finally, the defendants argue that the verdict is excessive and against the weight of the evidence.

On January 4, 1995, at the age of 57, Barbara Greer began work at the St. Jo Frontier Casino as a housekeeper. St. Jo Frontier Casino is a riverboat casino located on the Missouri River at St. Joseph. On her first day of work, Mrs. Greer slipped in a puddle of water while she was in the casino's maintenance shed. Greer sustained multiple fractures to her right kneecap as a result of the fall, and underwent surgery the following day. Dr. Bruce Smith, the orthopedic surgeon who performed the surgery, released her to return to light duty on May 12, 1995, and to full duty without restrictions on August 15, 1995. On July 21, 1996, Greer again went to see Dr. Smith complaining of ongoing and increasing pain in her right knee. Dr. Smith opined that she might need a knee replacement in 10 to 20 years.

On February 22, 1997, Greer twisted her right knee on the step at the back door of her home while carrying groceries into the house. As a result of this incident, Greer sustained a tear to the lateral meniscus in her right knee and a compression fracture to the adjacent tibial plateau. On June 20, 1997, Dr. Smith performed orthroscopic surgery on Greer's knee. Greer did not return to work after her 1997 fall.

In October 1997, Dr. Smith referred Greer to Dr. William J. Gondring, a board certified orthopedic surgeon. At trial, Dr. Gondring testified that Greer's second injury was caused by the instability and weakness that resulted from her initial slip at the riverboat casino. He testified that a total knee replacement operation would enable Greer to return to her employment. He recommended that she undergo the replacement immediately. He indicated that the replacement knee could be expected to last approximately 10 years, and would cost approximately $35,000.

John Ward, chairman of the Department of Economics at the University of Missouri–Kansas City, testified as an expert economist for the plaintiff. He testified, over defendant's objection, that the present value of Greer's lost earnings and lost ability to perform household chores was between $227,850 and $274,032, depending on whether future lost earnings were calculated to age 65 or 70. He conceded that if surgery allowed Greer to return to work, his calculations would change.

At the time of trial, Greer had not had the knee replacement operation, but she testified that she intended to do so at some time. Mrs. Greer stated that since her fall in 1997, she has had great difficulty performing housework and that she has been unable to engage in some of her favorite activities such as bowling, gardening and mushroom hunting. She indicated that she takes painkillers every day.

At the time of Greer's 1995 injury, the riverboat casino was not cruising. It was moored at the dock in St. Joseph from late November 1994 to early April 1995, due to winter weather and low water conditions. At trial, Captain Daise, the riverboat's captain, testified that the Missouri Gaming Commission gave the casino authority to moor the vessel to the dock. During this period, the United States Corps of Engineers stopped providing water to the Missouri River, and the United States Coast Guard stopped maintaining the navigable channel. Thus, Captain Daise testified that it would not have been safe to cruise during that period.

During the four months that the riverboat casino was not cruising, its moorings

were changed from nylon rope to large steel cables, and extra rope lines were added. The vessel was moved closer to the docking barge and a 135–foot long shear barge was placed diagonally at the casino's bow to fend off any danger of ice on the river. A catwalk was installed on which the sewer, water and electric lines were remounted because they no longer had to be repeatedly disconnected for cruising. Electric heat lines were installed in an attempt to keep the sewer and water lines from freezing. It would have taken approximately one-half of a day to move the riverboat from its moorings, as compared to 10 minutes prior to that time.

■ Barbara Greer filed a personal injury suit against the defendant under the Jones Act, 46 U.S.C.App. § 688.[1] Pursuant to the Jones Act, a claimant must establish *seaman status* in order to obtain benefits. The test for seaman status under the Jones Act is whether the claimant has an employment-related connection to a vessel *in navigation*. *Shade v. Great Lakes Dredge & Dock Co.*, 154 F.3d 143, 154 (3 rd Cir.1998). In response, the defendants filed a motion for summary judgment alleging that the riverboat casino was not a vessel in navigation at the time of Greer's fall. The trial court denied defendants' motion for summary judgment. The trial court informed the parties that it did not believe that there was a factual dispute on the "in navigation" issue and, therefore, would rule the issue as a matter of law. Accordingly, at the instruction conference, the court ruled that the riverboat casino was "in navigation" pursuant to the Jones Act. The court further found that since the riverboat casino was "in navigation," Greer was a seaman for purposes of the Jones Act. At the close of evidence, the court rejected defendants' Instruction B and gave a verdict directing instruction that did not include the issue of

whether the casino boat was "in navigation" at the time of Greer's fall.

On March 18, 1998, the jury returned a verdict in the amount of $500,000 against the defendants, and judgment was entered on the verdict. The trial court overruled the defendants' motion for a new trial.

In their first point, the defendants contend that whether the riverboat casino was a "vessel in navigation" involves a factual dispute that reasonable jurors could decide differently. As such, the defendant argues that the trial court erred in ruling on this issue as a matter of law.

In *Chandris, Inc. v. Latsis,* the United States Supreme Court held that the issue of whether a vessel is in navigation is a question that can be withdrawn from jury consideration only when the facts and the law reasonably support only one consideration. 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995).

The plaintiff in *Chandris* was one of two supervising engineers responsible for updating the electronic and communication equipment on a fleet of cruise ships. 515 U.S. at 350, 115 S.Ct. 2172. Plaintiff suffered an eye injury while aboard a ship that was subsequently placed in dry-docks for six months. *Id.* Relying on these facts, the district court determined that the ship was out of navigation during the period that it was in dry-dock. *Id.* at 353, 115 S.Ct. 2172. Upon review, the Supreme Court concluded that the district court erred in not submitting the issue of whether the vessel was in navigation to the jury for determination. *Id.* Specifically, it found:

> When a case is tried to a jury, the fact question should be left to their consideration if sufficient evidence has been presented to provide basis for jury consideration. *Removing the issue from the jury's consideration is only appropriate*

1. The Jones Act provides that "any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury." 46 U.S.C.App. § 688.

*where the facts and law would reasonably support only one conclusion.*

*Id.* at 373, 115 S.Ct. 2172. (emphasis added).

■ In this case, the riverboat casino was moored to the dock during a four-month period. The fact the riverboat casino was not actually cruising at the very moment of her injury does not take the case out of the Jones Act. *See Chandris,* 515 U.S. at 373–74, 115 S.Ct. 2172. *See also McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). The general rule is that "vessels undergoing repairs or spending a relatively short period of time in dry-dock are still considered to be in navigation, whereas, ships being transformed through major overhauls or renovations are not." *Chandris,* 515 U.S. at 373–74, 115 S.Ct. 2172.[2] Courts typically apply a broad view of what constitutes a "vessel in navigation" in an effort to provide a liberal interpretation of the Jones Act. *Chandris,* 515 U.S. at 374, 115 S.Ct. 2172. *See also Butler v. Whiteman,* 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958)(stating that seaman status must be liberally construed to effectuate the beneficial purposes of the Jones Act).

■ The facts in the present case are that the riverboat had been in navigation before it was docked due to weather conditions. It had been built as a river vessel, commissioned, inspected and licensed as a river vessel and had sailed the Missouri River with a captain, crew and passengers. However, it was not cruising during the four-month period in the winter, but was scheduled to recommence when the water level of the river was raised. The United States Corps of Engineers stopped providing water to the Missouri River, and the United States Coast Guard stopped maintaining the navigable channel. Once that water condition was remedied, the vessel did return to cruising the Missouri River. The vessel was directly on the river as opposed to being a "moor boat."

During the period that the riverboat casino was not sailing the ship, it maintained a crew consisting of a captain, an engineer, two deckhands and two security officers—a reduction of one deckhand and one security officer—which met the Coast Guard licensing requirements. The crew continued to undergo mandated training for maritime disasters. The captain was required to be on board in the cruising season, and in the winter whenever there were passengers on board. The gaming customers were considered passengers. During the cruising season, the captain was allowed to make the decision to remain dockside when water levels were too low or weather conditions were unsafe. During the period that the boat was moored to the dock, there was no change in the safety equipment included on the vessel, which was required to be on board by the licensing agencies.[3] Furthermore, during that period, the riverboat casino continued to be a commissioned vessel, licensed by the U.S. Coast Guard and the Missouri Gaming Commission. It was never decommissioned. In fact, the Gaming Commission gave the riverboat casino permission to moor the vessel to the dock.

The vessel was never deemed unseaworthy. The crew periodically fired up the engines and generators. During this time

---

**2.** *See also West v. U.S.,* 361 U.S. 118, 122, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959) (determining that a vessel was withdrawn from navigation where major repairs where needed to make her seaworthy); *Garcia v. Universal Seafoods, Ltd.,* 459 F.Supp. 463 (W.D.Wash.D.C.1978) (finding that retired liberty ship that had not been moved in almost three years, and whose engine controls were removed was withdrawn from navigation); *Hawn v. American S.S. Co.,*

107 F.2d 999 (2 nd Cir.1939)(holding that vessel that was out of commission for one year, that was unused for any purpose except to store soybeans, and that had no captain or crew, was withdrawn from navigation).

**3.** This includes 680 flotation devices, fire extinguishers, a rescue boat, flares, whistles or horns, running lights and radios for communication.

period, the riverboat was required to maintain daily logs because it was considered to be a vessel. When an adequate water level was assured, the riverboat could have been launched within four hours. Although the vessel had been withdrawn from cruising the river because of the dangerously low water level, all of the evidence showed that it was moored only temporarily during the winter months for the safety of the passengers. As such, the evidence supports only one conclusion; namely, that the riverboat casino was "in navigation" as defined by the Jones Act during the four-month period that it was not cruising.

The trial court should determine whether a vessel was "in navigation" when the underlying facts are not in dispute and where only one conclusion is reasonably possible. *Chandris*, 515 U.S. at 373, 115 S.Ct. 2172. In view of these facts, we conclude that there was no evidentiary basis for a jury to find that the riverboat casino was withdrawn from navigation at the time of her injury. *See e.g. Garcia v. Universal Seafoods, Ltd.*, 459 F.Supp. 463, 465 (W.D.Wash.1978). As a result, the court did not err in ruling that the riverboat casino was a vessel "in navigation" at the time of the plaintiff's injury.

In their second and third points on appeal, the defendants complain that the trial court erred in giving verdict directing Instruction 7, as opposed to defendants' proposed Instruction A, because it failed to submit to the jury the issue of whether the casino was a vessel in navigation at the time of plaintiff's injury. Our holding, *supra*, is determinative of these issues.

In their fourth point, the defendants argue that there was no factual basis for an expert economist's opinion, as to the total value of lost wages and the economic value of lost household services over the remainder of the plaintiff's work life. Specifically, the defendants contend that the testimony of future lost damages, presented by

the plaintiff's economic expert, John Ward, was erroneously admitted because it was not supported by the plaintiff's underlying evidence.

At trial, Dr. Gondring testified that Greer could not perform those duties expected of her at work because of her injuries. The evidence was that her injuries resulted in increased weakness and instability of the knee, pain, and severe degenerative arthritis, all of which was progressive and permanent. Consequently, she was currently prevented from performing those functions expected of her in her duties at work and home. However, there was also undisputed evidence that a total knee replacement would relieve 90 to 95 percent of her pain, improve stability, restore function to her knee, and allow her to return to work. Mrs. Greer testified that eventually she would have the surgery replacing her knee but was unsure as to when she would have the operation.

Before the economist's testimony was presented, the defendants objected, asserting that there was no foundation for him to testify to future lost wages or loss of ability to perform household services. The objection was overruled and, with the agreement of the court and counsel to a continuing objection, Ward testified that Greer would sustain future lost earnings in the amount of $43,143 or $89,326, depending on whether she would have worked to age 65 or 70. In addition to the lost wages, he testified that the present value of her lost ability to perform household services for the remainder of her life expectancy of 22.2 years was $154,437, bringing the total future losses between $227,850 and $274,032. His testimony was based on the assumption that she would be physically unable to work until the age of 65 or 70. He conceded that if his assumption was incorrect, his assessment of lost wages and ability to perform household services would be different.[4]

---

**4.** This is not a question of mitigation of damages, but whether there was factual support

for the expert's opinion that she would be unable to work for the remainder of her work

■ The admission or exclusion of an expert's testimony is within the sound discretion of the trial court, and will not be disturbed on appeal unless there has been an abuse of discretion. *George Weis Co. v. Dwyer*, 956 S.W.2d 335, 339 (Mo.App. 1997). It is a clear abuse of discretion when the court's ruling is against the logic of the circumstances or when it is arbitrary and unreasonable. *State v. Williams*, 828 S.W.2d 894, 899 (Mo.App. 1992).

Defendants rely on the general rule that "an expert witness can only testify as to the future consequences of an injury if they are reasonably certain to occur." *Hobbs v. Harken*, 969 S.W.2d 318, 324 (Mo.App.1998)(citing *Stuart v. State Farm Mutual Auto. Ins. Co.*, 699 S.W.2d 450, 455 (Mo.App.1985)). The defendants argue that the economist's testimony was not supported by credible medical evidence because it was based on the assumption that plaintiff's medical condition would not improve and that she would be unable to work because of her injury. In support of this argument, the defendants point to the fact that both of the plaintiff's medical experts testified that their recommendation of a total knee replacement would allow Greer to work again. Mrs. Greer testified that she was going to have the operation some time in the future, but she had not yet decided when the surgery would occur.

In *Hobbs*, Mr. Hobbs was involved in a four-car collision resulting in neck, back, and ear injuries. 969 S.W.2d at 320. Hobbs presented testimony from two medical experts, as well as testimony from John Ward, the economic expert that testified in this case. *Id.* Neither the medical experts nor Hobbs testified that his injuries would affect his ability to work. *Id.* Moreover, one of the medical experts testified that there was therapy and surgery available to correct the condition, but

Hobbs testified that he did not participate in this treatment because he could not pay its costs. *Id.* Ward testified, over the defendant's objection, that Hobbs' estimated future lost income would be between $180,-585 and $274,480, based on the assumption that Hobbs would suffer lost earning capacity for 20 years into the future. *Id.* Relying on this evidence, the jury returned a verdict for Hobbs for $340,000. *Id.*

Upon review, this court held that Ward's testimony regarding future earning capacity was improperly admitted without the necessary factual or evidentiary support. *Id.* at 324–25. In reaching that opinion, this court noted that neither medical expert stated, to a reasonable degree of medical certainty, that Hobbs' condition would be permanent or last 20 years into the future. *Id.* at 325. This court reasoned that it was not enough for the doctor to testify to the possibility of a certain result; his testimony should show that it is reasonably certain to follow the injury. *Id.* at 324. "It would be unjust to compel one to pay damages for results that may or may not ensue and which are merely problematical." *Id.* (citing *First National Bank of Fort Smith v. Kansas City So. R.R. Co.*, 865 S.W.2d 719, 738 (Mo.App.1993)). As such, the court reversed and remanded the case for a new trial on all issues. 969 S.W.2d at 327.

In *First Nat. Bank v. K.C. So. RR.*, this court addressed this issue under factually similar circumstances. 865 S.W.2d at 725–26. There, the trial court permitted the plaintiff's "life care expert" to testify that future care for the plaintiff would cost $1.8 million, based on the assumption that the plaintiff would be confined to a wheelchair. *Id.* at 738. As a result, the jury found that the plaintiff had suffered $4.5 million in damages. *Id.* On appeal, this court concluded that the expert testimony was prejudicial and should not be admitted on retrial unless supported by substantial and

life, or whether she would be able to complete her household chores for the 22.2 remaining

years of her life.

competent evidence. *Id.* The court reasoned that consequences which are contingent, speculative, or merely possible are not proper to be considered by the jury in ascertaining the damages, for it would be plainly unjust to compel one to pay damages for results that may or may not ensue and which are merely problematical. *Id.* (citing *Hahn v. McDowell,* 349 S.W.2d 479, 482 (Mo.App.1961)).

 In the present case, Ward's testimony was based on the assumption that Greer, age 60 at the time of trial, would not be able to work for the next five or ten years and would be unable to perform household services for the rest of her life. An expert may base an opinion on hypothesized facts, but when such an opinion (other than one stated on cross-examination) is based upon hypothesized information, the facts must be either in the record or admissible as evidence. *Lytle v. T–Mac, Inc.,* 931 S.W.2d 496, 500 (Mo.App. 1996). The evidence does not support the expert's assumptions that Greer would be unable to work until age 65 or 70 or unable to perform household services for the rest of her life. To the contrary, both of Greer's doctors, Drs. Smith and Gondrings, testified that she would be able to work if she had her knee replaced. Mrs. Greer's own testimony—that she intended to have a knee replacement—especially undercut the foundation for the economist's opinion. Granted, she was uncertain as to the date she would have the operation, but that begs the fact that it would be done at some time in the future. It left the experts' assumption that she would be unable to work for the next five or ten years without a factual basis.

At several points in the plaintiff's medical expert deposition testimony, Drs. Gondring and Smith testified that Greer was a candidate for a knee replacement and that from the standpoint of her pain, she was ready for the operation. The doctors also testified that a knee replacement would enable Greer to return to her employment and eliminate 90 to 95 percent of her pain. Specifically, Gondring stated:

Q. You believe that based upon the condition of the knee at the time that you examined it in October of 1997, that the appropriate treatment and remedy was a knee replacement?

A. That's correct, Counselor.

Q. And what relief can she be expected to obtain if she has the procedure?

A. She would obtain 90 to 95 percent relief of her pain.

Q. What about function?

A. The function depends on the—The function depends on the ligamentous integrity and of the knee replacement—the type of knee replacement and the model that's used. I think, without question, that her function would be better, her stability would be better, and she would be able to return to work.

Q. You've recommended to her that she have it?

A. That's exactly right.

Q. And you believe, based upon reasonable medical certainty, that if she follows your advice she is going to be a lot better off both in function and employability, lifestyle, and pain?

A. That's correct.

At the time of trial, Greer had not had the knee replacement operation, but she testified that she eventually would have the operation.

There was no evidentiary support for the assumptions made by Ward that Greer's lost wages would continue until age 65 or 70, or that her inability to do household services would continue for the rest of her life. While testimony of future economic loss is admissible, there is no factual basis for the introduction of loss calculations for 5, 10 or 22.2 years as it assumes no rehabilitation of the injury would occur—an assumption that is prohibited by the evidence. The expert's tes-

timony concerning future lost earnings and lost economic value of future household services was prejudicial, and the trial court erred in permitting the testimony. *Hobbs,* 969 S.W.2d at 325, *First Nat.,* 865 S.W.2d at 738.

Finally, the defendants argue that the verdict is excessive and against the weight of the evidence. The holding, *supra,* renders the point moot.

Reversed and remanded for a new trial.

SMART, P.J., and LAURA DENVIR STITH, J., concur.