Denise DAVIS, Appellant,

v.

The MISSOURI GAMING COMPANY d/b/a Argosy Riverside Casino, Respondent.

No. WD 58768.

Missouri Court of Appeals, Western District.

May 15, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 3, 2001.

Application for Transfer Denied Aug. 21, 2001.

Bruce C. Jackson, Jr., Kansas City, for appellant.

Robert W. Tormohlen, Kansas City, for respondent.

Before JOSEPH M. ELLIS, Presiding Judge, HAROLD L. LOWENSTEIN, and PATRICIA BRECKENRIDGE, Judges.

ELLIS, Presiding Judge.

Denise Davis appeals the trial court's grant of summary judgment to the Missouri Gaming Company d/b/a Argosy Riverside Casino (Argosy Casino). Davis was employed by the Argosy Casino in June 1994, as a pit manager[1] aboard its gaming casino, the Argosy IV Riverboat (Argosy IV). On June 20, 1996, while participating in a United States Coast Guard fire drill on board the Argosy IV, Davis was injured when an automatic water-tight door began to close. As Davis was walking through the doorway, a metal floor piece in the doorway flipped up creating a hole in the floor into which she fell.[2] Davis suffered several abrasions on her shin as well as injuries to her left foot, left leg, left knee, and her nervous system.

In September 1996, Davis filed a claim with the Missouri Division of Workers' Compensation. Argosy Casino filed a response to Davis' claim for workers' compensation arguing that the Merchant Marine Act, 46 U.S.C. § 688 (Supp.2000) ("the Jones Act"), preempted any workers' compensation claim. Immediately following her injury, Argosy IV filed an accident report with the Coast Guard[3] and began paying Davis $15.00 per day in "maintenance" during the period of her total disability in accordance with provisions of the Jones Act. In addition to maintenance, Davis received supplemental pay from Argosy Casino, which was available pursuant to a special program established by Argosy Casino for its Jones Act employees injured in the course of their employment.[4]

---

1. A pit manager oversees the game tables. In addition to overseeing the game tables, Davis was responsible for crowd control during emergency drills.

2. The hole in the floor was the same length as the opening of the doorway, approximately four or five feet long, it was approximately six to eight inches wide and eighteen inches deep.

3. The accident report was titled, "Report of Marine Accident, Injury or Death."

4. The supplemental pay was a fully discretionary program adopted by Argosy Casino in order to supplement the maintenance payment received by Jones Act employees. The amount of supplemental pay varied on a sliding scale: for up to three months after the injury, the supplement together with the

On January 15, 1998, Davis filed an action against Argosy Casino pursuant to the Jones Act and general maritime law seeking damages for personal injury, past and future disability, past and future loss of income, and past and future pain and suffering. On January 20, 1999, Argosy Casino filed a Motion for Summary Judgment, arguing that Davis' claim under the Jones Act was improper and the only remedy available to her was through Workers' Compensation Law. The trial court denied Argosy Casino's motion on March 25, 1999. On November 8, 1999, Davis filed a Motion for Partial Summary Judgment arguing she was entitled to judgment as a matter of law on the issue of Jones Act jurisdiction and the classification of the Argosy IV as a Jones Act "vessel". On May 22, 2000, the trial court entered a Judgment denying Davis' Motion for Partial Summary Judgment, and, upon reconsideration, granting Argosy's original Motion for Summary Judgment. In its judgment, the court found that the Jones Act did not apply and Davis' exclusive remedy was under the Missouri Workers' Compensation Law. Davis appeals this determination.

■■■■ Our review of an appeal from a summary judgment is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We will review the record in the light most favorable to the party against whom summary judgment was entered and take the facts set forth in the movant's motion as true unless they are contradicted by the non-movant's response to the summary judgment motion. *Id.* Summary judgment is proper when the movant can establish that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Id.* at 377. "[A] 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.* at 382. However, summary judgment is " 'an extreme and drastic remedy and great care should be exercised in utilizing the procedure.' " *Id.* at 377 (quoting *Cooper v. Finke*, 376 S.W.2d 225, 229 (Mo.1964)).

Davis presents three points on appeal, all of which essentially claim that the trial court erred in granting summary judgment because genuine issues of material fact exist regarding the status of the Argosy IV as a vessel in navigation on the date Davis was injured. She argues in those three points that an issue of Jones Act jurisdiction was created when: (1) Argosy Casino initially treated her claim as a Jones Act claim and denied Workers' Compensation, (2) at the time of her injuries, the Argosy IV was a fully operational riverboat floating on the Missouri River, and (3) her injuries occurred during a Coast Guard drill, and her injuries were caused by equipment used specifically on vessels in navigation.

The Jones Act is a federal remedy originally constructed to award seamen damages for bodily injury caused by the negligence of any officers, agents, or employees of the carrier. *Wiora v. Harrah's Illinois Corp.*, 68 F.Supp.2d 988, 995–96 (N.D.Ill. 1999); *See also, McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342, 111 S.Ct. 807, 810, 112 L.Ed.2d 866 (1991). The Jones Act provides in pertinent part as follows: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by

maintenance would total 67% of that employee's gross salary; every three months, the percentage of gross salary decreased until it bottomed out at 40% of gross income after twelve months.

jury...." 46 U.S.C. § 688(a). In accordance with the plain language of the statute, in order to qualify for Jones Act jurisdiction, a person must be (1) a seaman, (2) who was injured, (3) in the course of her employment. This Court previously determined that in order "[t]o be covered by the Jones Act, a claimant must prove that she was injured 'in the course of her employment' as a 'member of a crew of any vessel.' " *Greer v. Continental Gaming Co.,* 5 S.W.3d 559, 560 (Mo.App. W.D.1999)(quoting 33 U.S.C. § 902(3)(G)). "The test for seaman status under the Jones Act is whether the claimant has an employment-related connection to a *vessel in navigation.*" *Id.* at 562 (emphasis in original); *See also, McDermott,* 498 U.S. at 355, 111 S.Ct. at 817 ("The key to seaman status is employment-related connection to a vessel in navigation."); *Johnson v. Continental Grain Co.,* 58 F.3d 1232, 1235–36 (8th Cir.1995). The critical issue before this court on appeal is whether the Argosy IV was a "vessel in navigation" in 1996 when Davis was injured.

■ The United States Supreme Court found in *Chandris, Inc. v. Latsis,* 515 U.S. 347, 373, 115 S.Ct. 2172, 2192, 132 L.Ed.2d 314 (1995), that "whether a vessel is or is not 'in navigation' for Jones Act purposes is a fact-intensive question that is normally for the jury and not the court to decide." "Removing the issue from the jury's consideration is only appropriate where the facts and the law will reasonably support only one conclusion...." *Id.; See also, Greer,* 5 S.W.3d at 562 ("the issue of whether a vessel is in navigation is a question that can be withdrawn from jury consideration only when the facts and the law

reasonably support only one conclusion." (*citing Chandris,* 515 U.S. at 373, 115 S.Ct. at 2192.)). The Jones Act provides an expansive remedy for seamen, and the policy behind that remedy mandates that even marginal claims are properly left for a jury's determination. *Tonnesen v. Yonkers Contracting Co., Inc.,* 82 F.3d 30, 33 (2nd Cir.1996).

The facts and circumstances specific to the Argosy IV are as follows. In 1994, the Argosy IV was built in Mobile, Alabama, as a fully functioning riverboat. After being certified by the United States Coast Guard in September 1994, the Argosy IV sailed up the Mississippi and Missouri Rivers from Mobile, Alabama, to Riverside, Missouri, under its own power and with its own crew. From September 1994 through July 1995, the Argosy IV carried crew and passengers on the Missouri River, when not proscribed by weather or river conditions, making twelve cruises per day. The Missouri Gaming Commission gave the Argosy IV approval and permission to stop cruising the Missouri River on gaming excursions on July 12, 1995.

In January 1996, the Argosy IV was placed in a man-made lagoon adjacent to the Missouri River. Argosy Casino attempted to maintain a seven-foot deep channel from the lagoon to the Missouri River to allow tugboats to enter or the Argosy IV to leave the lagoon.[5] Because of the channel connecting the lagoon to the Missouri River, the Argosy IV was floating on water from the Missouri River, and it was subject to the rise and fall of the River levels. While in the lagoon, the Argosy IV was connected to a barge by

---

5. The Argosy IV has not been removed from its manmade lagoon, nor has it sailed down the Missouri River since January 1996. If the channel remained seven feet deep at all times, it was possible to move the Argosy IV from the lagoon to the Missouri River, however, if the depth of the water was less than seven feet, the boat could not be moved out of the lagoon.

using six one-inch steel mooring cables.[6] The barge holds a tower that supports a passenger ramp between the land and the barge, and another passenger ramp from the tower to the casino. The Argosy IV was also connected to several land-based utilities consisting of telephone lines, sewer lines, waterlines, and four electrical shore power plugs.[7] On April 12, 1996, the Missouri Gaming Commission entered a final order authorizing the Argosy IV to be operated as a "continuously docked excursion gambling boat. . . ." But the order did not prohibit the Argosy IV from cruising.[8]

In order to maintain its Coast Guard certification, the Argosy IV was required to maintain a marine crew, life saving and safety materials, comply with Coast Guard regulations, and remain subject to quarterly Coast Guard inspections. The boat was in the process of being inspected when Davis was injured. At the inspection on June 20, 1996, the Argosy IV was manned and maintained by a full-time marine crew, consisting of a senior captain, captains, engineers, mates and deckhands. The Argosy IV was equipped with three main propulsion engines driving "Z" drive units and one paddle wheel, two bow thrusters, three ship service generators, an emergency diesel generator, 1,800 life preservers, 6 ring buoys and two rescue boats. During the inspection, the Coast Guard conducted operational tests on power units, fire and bilge pumps, bilge alarms, water-tight doors, steering, radar, VHF radio, fathometer, fire screen doors, propulsion plant, ship's service generator, emergency lighting, whistle/bell, navigation lights and the fire/smoke detection system.

On May 11, 1998, some two years after Davis was injured, Argosy Casino notified the United States Coast Guard of its intent to surrender its Certificate of Inspection for the Argosy IV and requested that the Coast Guard approve the mooring arrangement of the Argosy IV. On May 29, 1998, the Coast Guard notified Argosy Casino that it determined that the Argosy IV was permanently moored as defined by Coast Guard policy. As part of the permanent mooring process, a Coast Guard inspection was conducted in August 1998. When inspected on that date, the required crew aboard the Argosy IV consisted of one master, one licensed mate, one chief engineer, one engineer technician, six deck hands and six deck/security personnel. At the time of this inspection, the Argosy IV was equipped with 1,800 life preservers, six ring buoys and two rescue boats. In November 1998, the Argosy IV was decertified by the Coast Guard for the first time since it was built in September 1994.

■■■■■ Respondent argues that the Argosy IV was merely a work platform, not a vessel for Jones Act purposes. Alternatively, it argues that because the Argosy IV was moored to a barge and was no longer cruising the Missouri River at the

---

6. The record is unclear as to when the Argosy IV was first moored to the barge; however, the deposition of Thomas Paschall, chief engineer of the Argosy IV, revealed that in June 1996, when Davis suffered her injury, it would take approximately thirty minutes to disconnect the Argosy IV from the steel mooring cables.

7. The deposition of Paschall revealed that in June 1996, it would have taken seconds to disconnect the Argosy IV from the telephone lines, approximately fifteen to twenty minutes to disconnect the land-based electrical power, approximately five to ten minutes to disconnect the land-based sewer and water connections.

8. The exact words used by the Missouri Gaming Commission were in pertinent part as follows: "IT IS ORDERED that 'Missouri Gaming Company shall be authorized to operate a continuously docked excursion gambling boat under authority of its previously issued licenses and permits. . . .'"

time of Davis' injury, it was withdrawn from navigation. We must first address the argument that the Argosy IV is not a vessel, but a work platform. The Fifth Circuit, in *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir.1995), outlined some common characteristics of work platforms (the *Bernard/Gremillion* work-platform attributes): (1) the structure was constructed to be used primarily as a work platform, (2) the structure was moored or otherwise secured at the time of the accident, and (3) although the structure was capable of movement, any transportation function performed by the structure was merely incidental to its primary purpose of serving as a work platform. *Id.* at 569.[9] "The greater the structure's resemblance to conventional seafaring craft, the greater the odds of securing vessel status." *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 293 (5th Cir.1990). In light of the bias favoring traditional craft, courts "look to whether a given structure maintains or possesses (1) navigational aids, (2) lifeboats and other life-saving equipment, (3) a raked bow, (4) bilge pumps, (5) crew quarters, and (6) registration with the Coast Guard as a vessel." *Id.* We will also consider the intention of the owner to move the structure on a regular basis and the length of time that the structure has remained stationary. *Id.*

The Argosy IV was not constructed primarily as a work platform. Instead, the Argosy IV was designed to cruise the Missouri River, in fact, it made twelve cruises

per day, weather permitting. While the Argosy IV was moored to a barge, there is no indication in the record how long the Argosy IV had been moored to the barge prior to Davis' injuries. The Argosy IV was designed to transport passengers up and down the Missouri River, thus, we cannot say that the transportation function of the structure was merely incidental to its primary purpose. Moreover, the Argosy IV resembled a conventional seafaring craft with its navigational aids, life-saving equipment, bilge pumps, and Coast Guard registration and license.

Respondent argues that after the Argosy IV was moored, Argosy Casino had no intention of removing the riverboat from the manmade lagoon. Thomas Paschall, the Senior Chief Engineer of the Argosy IV, stated in his deposition that "Argosy has no plans to remove the riverboat from the manmade lagoon and it is moored in such lagoon indefinitely."

▮ We note first that Argosy Casino's intention to permanently moor the Argosy IV is not determinative of whether Argosy IV remains a vessel in navigation. But assuming *arguendo* that it did, Argosy Casino's evidence of intent is contradicted by its actions. Argosy Casino treated Davis' claim as a Jones Act claim from the moment she was injured by paying her maintenance and supplemental pay created for Jones Act employees; Argosy Casino maintained a full marine crew and Coast Guard certification until November 1998; Argosy Casino did not request "permanently moored" status from the Coast

---

9. While the Fifth Circuit takes an almost historical approach in analyzing whether a structure is a work platform by looking at the original purpose for which the structure was constructed, the Court expanded the definition in *Ducrepont v. Baton Rouge Marine Enters., Inc.*, 877 F.2d 393 (5th Cir.1989), by recognizing that a structure could be a work-platform even if it was not originally constructed to be a work-platform, as long as it was primarily used as a work platform at the time in question and met the other work-platform factors. The Second Circuit found the first factor of the test to be the present purpose of the floating structure instead of its original purpose. *See Tonnesen v. Yonkers Contracting Co., Inc.*, 82 F.3d 30, 36 (1996).

Guard until May 1998, approximately two years after Davis' injury; and Argosy Casino continued to dredge the channel from the Missouri River to the lagoon to a depth sufficient to allow the Argosy IV to leave the lagoon or other vessels to enter the lagoon. All of these facts create an issue as to the Argosy Casino's intention or belief that the Argosy IV was permanently moored at the time of Davis' injury.

Examples of casinos determined to be work platforms instead of vessels include the *Shreveport Rose*, a riverboat casino equipped with a pilothouse and a radar unit, but no galley or crew quarters, which was towed to Shreveport, Louisiana, and immediately moored in a coffer cell on the Red River. *McAdow v. Promus Cos., Inc.*, 926 F.Supp. 93, 94 (W.D.La.1996). The *Shreveport Rose* never transported passengers or cargo across navigable waters, nor was it intended for such use, and a crane barge was needed to lift the gate of the coffer cell in order to move the casino. *Id.* at 95–96.

The *Lady of the Isle*, a riverboat casino equipped with navigational equipment, radar, bilge pumps, a propulsion system, ballasts tanks, lifeboats, independent utilities, fire detection and PA systems, sailed up the Red River and into a containment pond in Bossier City, Louisiana, where it remained. *Chase v. Louisiana Riverboat Gaming, P'ship*, 709 So.2d 904, 906–07 (La.App. 2nd Cir.1998). After being placed in the containment pond, a steel wall was set in place, reinforced by four steel buttresses and twenty-five tons of rock, which sealed the pond off from the Red River and protected the casino from the rise and fall of the Red River. *Id.* at 906. The casino was moored to shore and attached to an entrance ramp on one end and a land-based edifice on the other. *Id.* The Second Circuit Court of Appeals of Louisiana determined that the *Lady of the Isle* was removed from navigation and was a work platform after emphasizing the following characteristics of the craft: its sole purpose was to operate a gaming establishment; it was specifically built for casino operations; it was enclosed in a containment pond; it was insulated from the changes in the River; it would take extensive work to remove the casino from its containment pond; and it had never been used to transport cargo or passengers across navigable waters. *Id.* at 910.

And finally, the *Grand Casinos*, a shoreside casino constructed partially out of navigable barges, was determined to be a work platform in spite of the fact that it had been towed previously over navigable waters and towed again to avoid damage by Hurricane Andrew in 1992. *King v. Grand Casinos of Mississippi, Inc.–Gulfport*, 697 So.2d 439, 440 (Miss.1997). The *King* Court relied on *Ketzel v. Mississippi Riverboat Amusement, Ltd.*, 867 F.Supp. 1260 (S.D.Miss.1994), for the proposition that:

> The mere fact that a structure is floating or "capable of movement across navigable waters" does not grant "vessel" statutes (sic). (citations omitted). A structure, by virtue of its flotation, is therefore not exposed to the hazards of the sea sufficient to grant "seaman" status. . . . That a floating structure may be moved periodically because of the dangers of inclement weather is not sufficient to convert its status to a vessel.

*King*, 697 So.2d at 441 (quoting *Ketzel*, 867 F.Supp. at 1267).

█ After comparing the facts and circumstances surrounding the Argosy IV with those surrounding other riverboat casinos that were considered work platforms in foreign jurisdictions, we are not convinced that the evidence in the case at hand supports only one conclusion: that the Argosy IV was a work platform.

While the Argosy IV is similar to many of the riverboat casinos analyzed in other opinions, there are also substantial differences among the crafts. The Argosy IV transported passengers up and down the Missouri River for approximately a year and a half instead of being immediately moored upon its arrival in Riverside, Missouri. Although the Argosy IV was moored sometime in 1996, it was still subject to the rise and fall of the Missouri River, it would take minimal effort to disconnect the Argosy IV from the shore and begin cruising again, and Argosy Casino continued dredging the canal that connected the lagoon to the main channel of the River in an effort to maintain a passageway for the Argosy IV to leave the lagoon if so desired.

 We next turn to Respondent's other argument that the Argosy IV was withdrawn from navigation at the time of Davis' injuries. "The withdrawn-from-navigation idea ... distinguish[es] craft (sic) or structures that meet the general dictionary definition of 'vessel' from those that meet Jones Act or general maritime law vessel status at a given time, such as when a craft or structure has been 'laid up for the winter.' " *Pavone*, 52 F.3d at 569 (citing *Desper v. Starved Rock Ferry Co.*, 342 U.S. 187, 191, 72 S.Ct. 216, 218, 96 L.Ed. 205 (1952) (quoting *Hawn v. American S.S. Co.*, 107 F.2d 999, 1000 (2nd Cir. 1939))). If a craft or structure has been withdrawn from navigation, it usually relinquishes its vessel status under the Jones Act. *Id.* "In general, the term 'vessel in navigation' is a broad term that encompasses many vessels that do not literally navigate the high seas." *Kathriner v. UNISEA, Inc.*, 975 F.2d 657, 659 (9th Cir. 1992). "Generally, floating structures are not classified as vessels in navigation if they are incapable of independent movement over water, are permanently moored

to land, have no transportation function of any kind, and have no ability to navigate." *Id.* at 660. But, the fact that the riverboat casino was not actually cruising at the very moment an injury occurs does not take the case out of the Jones Act jurisdiction. *Greer*, 5 S.W.3d at 563. " '[A] vessel does not cease to be a vessel when [it] is not voyaging, but is at anchor, berthed, or at dockside' ... even when the vessel is undergoing repairs." *Chandris*, 515 U.S. at 373–74, 115 S.Ct. at 2192 (internal quotations and citations omitted). " '[A] vessel is in navigation, although moored to a dock, if it remains in readiness for another voyage.' " 515 U.S. at 374, 115 S.Ct. at 2192 (quoting 2 M. Norris, Law of Seamen § 30.13, p. 364 (4th ed.1985)).

In *Greer*, this Court determined that a riverboat casino that was moored to a dock for four months was a vessel "in navigation" for Jones Act purposes. 5 S.W.3d at 564. The facts and circumstances surrounding the riverboat casino involved in *Greer* are as follows:

During the four months that the riverboat casino was not cruising, its moorings were changed from nylon rope to large steel cables, and extra rope lines were added. The vessel was moved closer to the docking barge and a 135–foot long shear barge was placed diagonally at the casino's bow to fend off any danger of ice on the river. A catwalk was installed on which the sewer, water and electric lines were remounted because they no longer had to be repeatedly disconnected for cruising. Electric heat lines were installed in an attempt to keep the sewer and water lines from freezing. It would have taken approximately one-half of a day to move the riverboat from its moorings, as compared to 10 minutes prior to that time.

* * *

[T]he riverboat had been in navigation before it was docked due to weather conditions. It had been built as a river vessel, commissioned, inspected and licensed as a river vessel and had sailed the Missouri River with a captain, crew and passengers. However, it was not cruising during the four-month period in the winter, but was scheduled to recommence when the water level of the river was raised.... Once that water condition was remedied, the vessel did return to cruising the Missouri River. The vessel was directly on the river as opposed to being a "moor boat."

During the period that the riverboat casino was not sailing the ship, it maintained a crew consisting of a captain, an engineer, two deckhands and two security officers ... which met the Coast Guard licensing requirements. The crew continued to undergo mandated training for maritime disasters.... The gaming customers were considered passengers.... During the period that the boat was moored to the dock, there was no change in the safety equipment included on the vessel, which was required to be on board by the licensing agencies. Furthermore, during that period, the riverboat casino continued to be a commissioned vessel, licensed by the U.S. Coast Guard and the Missouri Gaming Commission. It was never decommissioned. In fact, the Gaming Commission gave the riverboat casino permission to moor the vessel to the dock.
*Id.* at 561–62, 563.

There are numerous similarities between the riverboat casino in *Greer* and the Argosy IV. They both were built as river vessels and cruised the Missouri River carrying passengers. Both maintained their Coast Guard licensing, safety equipment, and crew while moored. Both river-

boats were given permission by the Missouri Gaming Commission to moor to the shore and both did so. Both boats hooked up to land based utilities and continued entertaining passengers after being moored. We note that there are some differences between the riverboat casino in *Greer* and the Argosy IV, namely that the riverboat in *Greer* began cruising the Missouri River again after being moored for four months, while the Argosy IV was moored for five months and then did not cruise again. But we note that Argosy Casino did not apply for permanent mooring status until 1998, two years after Davis' accident. Moreover, the Gaming Commission order did not preclude Argosy IV from cruising but rather merely authorized it to conduct its gambling operations while the boat was continuously docked. While there are some differences between the two cases, when we consider the state of both ships at the time the accidents in the respective injuries occurred, their situations were very similar.

Respondent relies heavily upon the United States Supreme Court's decision in *Chandris,* and the Fifth Circuit's decision in *Pavone,* to support its contentions that the Argosy IV was withdrawn from navigation. In *Pavone,* the United States Court of Appeals for the Fifth Circuit determined that the Biloxi Bell was both removed from navigation and was a work platform at the time in question. 52 F.3d at 570. The Court found that when the facts surrounding the Biloxi Belle were "compared to the functional and nautical characteristics and mooring statuses of the various craft that in earlier cases were held as a matter of law to be nonvessels for Jones Act purposes, there can be little doubt that indefinitely moored, shore-side, floating casinos, such as the BILOXI BELL, must be added to that list." *Id.* The Court in Pavone recognized that the

"vessel in navigation" inquiry was a fact specific inquiry and it qualified its finding by comparing the nautical and functional characteristics of the Biloxi Belle to those of previous cases and by inserting the phrase, "such as the Biloxi Belle" into its finding. *Id.* Accordingly, *Pavone* can and should be distinguished on its facts when compared to the case at hand. The Biloxi Belle, like the Argosy IV, possessed bilge pumps, was moored to shore, was connected to numerous land-based utilities, could be disconnected from land with minimal effort, and was authorized to travel on United States waterways. *Id.* at 564. But, unlike the Argosy IV, the Biloxi Belle had no engine, no captain, no navigational aids, no crewquarters, no lifesaving equipment, no working steering mechanism, and it was not constructed to be, nor has it ever been, used as a seagoing vessel to transport passengers, cargo or equipment across navigable waters. *Id.* The Biloxi Belle had a pilot house, ring buoys, and a motorized paddle wheel, all for purely visual effects,[10] and in order to move, it had to be towed because it could not move about on its own. *Id.* at 563–64. Moreover, all the workers on the Biloxi Belle were employed solely in connection with the casino operation. *Id.* at 564–65.

We are not the first court to distinguish *Pavone* on its facts. In *Wiora v. Harrah's Illinois Corp.,* 68 F.Supp.2d 988 (N.D.Ill. 1999), the Court found numerous similarities between the Biloxi Belle and the M/V Northern Star, the riverboat casino at issue in *Wiora,* but, because the M/V Northern Star traveled to Illinois on its own power, and had an engine, a captain, lifesaving equipment, crew quarters and full-time marine operations department employees, the Court found that the only

reasonable conclusion was that the M/V Northern Star did qualify as a vessel in navigation. *Id.* at 992–93. Based on this information, it appears as if the Argosy IV is more akin to the M/V Northern Star than to the Biloxi Belle.

*Chandris* involved a vessel that was placed in dry-dock for a six-month refurbishment. 515 U.S. at 351, 115 S.Ct. at 2181. Generally, the question before the Supreme Court in *Chandris* was whether the modifications made to the vessel were extensive enough to remove the vessel from navigation, for Jones Act purposes, as a matter of law. 515 U.S. at 374–75, 115 S.Ct. at 2193. In its opinion, the Court made a distinction between vessels which are undergoing minor repairs and those which are having major overhauls or renovations, finding that vessels undergoing major overhauls or renovations are not in navigation, while vessels undergoing repairs or spending relatively short periods of time in dry-dock are still considered "in navigation." *Id.* While *Chandris* is not factually similar to the case at hand because the Argosy IV was not undergoing any repairs while it was moored, the Court in *Chandris* found that the issue of whether the vessel remained "in navigation" while in dry-dock should have been submitted to the jury. 515 U.S. at 376, 115 S.Ct. at 2193.

We agree with the United States Supreme Court that the issue of whether the Argosy IV remained in navigation was an issue that should have been submitted to the jury. *See, Id.* Because a jury could reasonably conclude that the Argosy IV was a "vessel in navigation," Davis has raised disputed issues of material fact that preclude summary judgment. The issue of whether a vessel is in navigation is a very

**10.** The paddle wheel rested permanently above the water level and served no propul-

sion function.

fact-specific analysis, and in light of the unique fact situation surrounding the Argosy IV, we cannot follow the determinations made by other jurisdictions, that were confronted with different fact patterns, and declare that the Argosy IV was not a "vessel in navigation" as a matter of law. We find that there are two plausible and contradictory accounts of the essential facts surrounding the Argosy IV's status as a "vessel in navigation"; thus, the trial court erred in granting summary judgment and taking away from the jury the issue of whether the Argosy IV was a "vessel in navigation" and subject to Jones Act jurisdiction.

The trial court's grant of summary judgment is reversed and the cause is remanded for proceedings consistent with this opinion.

All concur.