Kathleen L. KETZEL, Plaintiff,

v.

MISSISSIPPI RIVERBOAT
AMUSEMENT, LTD.,
Defendant.

Civ. A. No. 1:93cv546GR.

United States District Court,
S.D. Mississippi, S.D.

Sept. 21, 1994.

David A. Hilleren, Hilleren, Bains & Le-Blanc, New Orleans, LA, Joseph A. LoCoco, D'Iberville, MS, for plaintiff.

Michael J. McElhaney, Jr., Colingo, Williams, Heidelberg, Steinberger & McElhaney, Pascagoula, MS, for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

This cause comes before the Court on the parties' motions for summary judgment in connection with plaintiff Kathleen L. Ketzel's lawsuit against defendant Mississippi Riverboat Casino for injuries and damages under the Jones Act and general Maritime Law arising out of her employment as a cocktail waitress on the allegedly "unseaworthy" Biloxi Belle Casino. The outcome determinative question is whether Ketzel was a "seaman" at the time of her alleged injury, which necessarily requires an inquiry into whether the Biloxi Belle is a "vessel" for purposes of the Jones Act. After due consideration of the evidence of record, the briefs of counsel, the applicable law, and being otherwise fully advised in the premises, the Court finds as follows.

### Standard of Review

■ Summary judgment is designed "to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1; *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986) (citation and internal quotation omitted); *see Berry v. Armstrong Rubber Co.,* 780 F.Supp. 1097, 1099 (S.D.Miss.1991), *af-*

*firmed,* 989 F.2d 822 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994). A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party, "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## Statement of Facts

The facts of this case are not complicated. It is undisputed that Ketzel worked as a cocktail waitress on the defendant's Biloxi Belle casino at the time of her alleged injury. Ketzel alleges that she received a severe knee injury during the course of her employment when she tripped on a garbage can lid negligently left in her path by the defendant's employees. The defendant concedes that the alleged injury occurred during the course of Ketzel's employment, but disputes her status as a "seaman" or a "crew member," a prerequisite to invoking federal jurisdiction over her claims. As set forth below, the Court's inquiry into this issue requires a close consideration of the facts relevant to the determination whether the Biloxi Belle is a "vessel" under the Jones Act.

## Legal Analysis

The issue is one of first impression in this Court. As a threshold matter, to establish a claim under the Jones Act[1], Ketzel must be a "member of a crew" or a "seaman." *Southwest Marine, Inc. v. Gizoni,* 502 U.S. 81, 87, 112 S.Ct. 486, 491–92, 116 L.Ed.2d 405 (1991).[2] Indeed, "[t]he inquiry

---

**1.** Congress enacted the Jones Act in 1915 (codified at 46 U.S.C. § 688 (1982)) "to fill the void in the general maritime law of negligence, and it became the sole basis upon which a seaman or his beneficiary may sue his employer for negligence." *Beltia v. Sidney Torres Marine Transp., Inc.,* 701 F.2d 491, 493 (5th Cir.1983) (citation and internal quotation omitted).

**2.** Ketzel's complaint alleged, alternatively, that her claim states a cause of action under the Longshore Harbor Workers' Compensation Act (LHWCA). However, Ketzel's job as a cocktail waitress is not included among the occupations

---

into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it." *McDermott International, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). The determination of "seaman" status is a "mixed question of law and fact." *Gizoni,* 502 U.S. at, —— – —— 112 S.Ct. at 491–92; *Wilander,* 498 U.S. at 356. The inquiry in such cases is whether the established facts meet the statutory standard for invoking federal jurisdiction as determined by an undisputed rule of law. *Wilander,* 498 U.S. at 356, 111 S.Ct. at 818; *see Pullman–Standard v. Swint,* 456 U.S. 273, 290 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982) (defining a mixed question).

When the facts underlying seaman status are reasonably in dispute, the issue must be resolved by the trier of fact. *See Wilander,* 498 U.S. at 342–43, 355–56, 111 S.Ct. at 810–11, 817–18 (issue whether the nature of plaintiff's work in connection with vessel entitled him to seaman status). On the other hand, if "the facts and the law will reasonably support only one conclusion," summary judgment is mandated. *Id.* at 356, 111 S.Ct. at 818; *Gremillion v. Gulf Coast Catering Co.,* 904 F.2d 290, 292 (5th Cir. 1990). Stated differently, summary judgment is proper in Jones Act cases "where the only rational·inference to be drawn from the evidence is that the worker is not a seaman." *Daniel v. Ergon, Inc.,* 892 F.2d 403, 407 (5th Cir.1990) (citation and internal quotation omitted).

"The key to seaman status is employment-related connection to a vessel in navigation." *Gizoni,* 502 U.S. at 88, 112 S.Ct. at 492

---

intended by Congress to constitute "longshoremen." *Id.* at 492 (citations omitted). Moreover, the parties agree that Ketzel's job was substantially confined to the Biloxi Belle. Assuming *arguendo* that Biloxi Belle was a vessel, LHWCA benefits would not be available. Congress enacted the LHWCA in 1927, *see* 33 U.S.C. § 901, et seq., extending benefits to all maritime workers *except* masters or members of a crew of a vessel ("seaman"), the latter falling under the Jones Act. *See Swanson v. Marra Bros. Inc.,* 328 U.S. 1, 4–6, 66 S.Ct. 869, 870–72, 90 L.Ed. 1045 (1946).

(citing *Wilander,* 498 U.S. at 355, 111 S.Ct. at 818). Although "vessel" is not defined in the Jones Act, see 46 U.S.C. § 688 (1982), "courts have naturally spoken of seamen in terms of ships, vessels, and voyages." *See Digiovanni v. Traylor Bros. Inc.,* 959 F.2d 1119, 1121 (1st Cir.) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992). "The existence of a vessel is a fundamental prerequisite to Jones Act jurisdiction and is at the core of the test for seaman status." *Gremillion,* 904 F.2d at 292 (citations and internal quotations omitted).

> Unfortunately, the term "vessel" has escaped precise definition, which helps to explain why special-use structures such as submersible oil and gas drilling platforms may qualify at times as Jones Act vessels, despite traditional notions in maritime jurisprudence to the contrary. The arguable vagueness of the term "vessel" also has led to serious, though unsuccessful, attempts to secure vessel status for floating planes and helicopters. Not surprisingly, it has been suggested that "three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale."

*Id.* at 292–93 (citations omitted).

In *Gremillion,* the disputed issue was whether a "quarterboat barge" was a vessel under the Jones Act. *Id.* at 293–94. The court applied the following analysis:

> As a general principle, where the vessel status of an unconventional craft is unsettled, it is necessary to focus upon the *purpose for which the craft is constructed and the business in which it is engaged.* The caselaw is heavily skewed in favor of conferring such status upon craft whose primary mission is the transportation of cargo, equipment or passengers over navigable waters. The greater the structure's resemblance to conventional seafaring craft, the greater the odds of securing vessel status.
>
> In light of this bias favoring traditional craft, it is not surprising that we look to whether a given structure maintains or possesses (1) navigational aids, (2) lifeboats and other lifesaving equipment, (3) a raked bow, (4) bilge pumps, (5) crew quarters, and (6) registration with the Coast Guard as a vessel. In addition, the intention of the owner to move the structure on a regular basis, the ability of the submerged structure to be refloated, and the length of time that the structure has remained stationary are also relevant to the inquiry. *Structures need not lack all of the above-mentioned attributes to be deemed nonvessels.* The greater the degree of attenuation from the attributes of traditional vessels ... the less likely that Jones Act jurisdiction and seaman status will be secured by the claimant.
>
> Nevertheless, exotic craft may qualify as vessels, especially if frequently navigated, or if exposed to the perils associated with maritime service, or if injury occurs during ocean transport. In fact, we have stated that *a structure whose purpose or primary business is not navigation or commerce across navigable waters may nonetheless satisfy the Jones Act vessel requirement if, at the time of the worker's injury, the structure was actually engaged in navigation.*

*Id.* at 293 (citations and internal quotations omitted; emphasis added). The *Gremillion* court also identified three common attributes for "dry docks and floating work platforms" that are deemed "nonvessels" as a matter of law:

> (1) The structure is constructed primarily as a work platform;
>
> (2) the structure is moored or otherwise secured at the time of the accident; and
>
> (3) although the platform is capable of movement, and is *sometimes moved across navigable waters in the course of normal operations, any transportation function is merely incidental to the platform's primary purpose.*

*Id.* at 293–94 (citations omitted; emphasis added).

The defendant submitted the affidavits of Jim Hasslocher, the owner and majority shareholder of the defendant corporation, and Steven Yates, who "participated in the design and supervised the construction of the

steel structure above the floating structure ('hull') of the Biloxi Belle." *See* Def's. Exhs. A & B. The affidavits indicate that the Biloxi Belle was originally constructed as a floating restaurant and was designed to conform to "the Southern Building Code for land-based restaurants." The structure was thus "designed and constructed without propulsion engines, rudders, and navigational equipment." The Biloxi Belle has never had a captain.

The affidavits further detail that the stern of the Biloxi Belle is "flat-bottomed, not raked." The Biloxi Belle was designed to resemble "an operational conventional ship" and was equipped with a decorative paddlewheel and a pilothouse. The paddlewheel rotates permanently above the water level and is powered by a small motor with water jets spraying outward from positions around the wheel to give the illusion of propulsion. The pilothouse contains only a light switch and a non-functional, antique steering wheel. The Biloxi Belle contains no lifeboats or lifesaving equipment, other than "decorative ring buoys" that "were not intended to serve any actual life-saving function." The Biloxi Belle has never had any running or anchor lights to assist in its navigation. Although the structure contains an emergency generator that was designed to provide electricity "to sustain 60% of the structure's operations as a restaurant," the Biloxi Belle "has always utilized shore-based power and utility sources."

The defendant also submits the affidavit of Neal Miller, Biloxi Belle's Vice–President, who indicates that, other than a plan to move the structure over to make way for another floating gambling structure, there are no intentions to move the Biloxi Belle from the location where it is presently moored. *See* Def's Exh. C. Miller testified on deposition that the bow of the Biloxi Belle is "raked so it can be towed easier." Pl.Exh. 22 at 35. Miller also testified that the Biloxi Belle was floating, but was moored by "dolphins" or pilings driven deep into the ground, against which the structure was secured by steel cables. *Id.* at 27, 35.

Ketzel contends that, *inter alia*, because the Biloxi Belle is registered with the Coast Guard, has "bilge pumps," "dining quarters," and an "employee break room," the result should be different. However, the factors set forth by *Gremillion* "are not to be applied mathematically but are useful guides in determining vessel status." *See Gremillion*, 904 F.2d at 294 n. 9. Applying *Gremillion*'s attribute test, the foregoing characteristics suggest that the Biloxi Belle is not a vessel under the Jones Act.

Ketzel seeks, however, to distinguish the guidelines summarized by *Gremillion*, contending that they are applicable to dry docks and work platforms only. Ketzel contends further that such crafts primarily assist workers involved in "construction and marine repair," contrasted by the Biloxi Belle's more elaborate design as a "vessel facility" for its employees. Ketzel apparently contends further that, assuming *arguendo* that the Biloxi Belle falls under a work-platform analysis, the Supreme Court's decision in *Gizoni*, decided after *Gremillion*, requires that the fact question of whether a work platform is a vessel *must* be determined by a jury. This Court disagrees with Ketzel's analysis of relevant caselaw.

In *Gizoni*, a platform case, the claimant [Gizoni] was a rigging foreman for a ship repair facility and was transporting a rudder from a shipyard to a floating dry dock when his foot broke through a thin wooden sheet covering a hole in the deck of the platform. *See Southwest Marine, Inc. v. Gizoni*, 909 F.2d 385, 387 (9th Cir.1990). Gizoni alleged permanent injuries and disabilities. He sued his employer for LHWCA benefits, then later filed a suit under the Jones Act. *Id.* The district court entered summary judgment in favor of the employer, and the Sixth Circuit reversed, concluding that material issues of fact regarding Gizoni's "seaman" status were unresolved, including whether the platform on which he was riding was a vessel. *Id.* at 388–89. The Supreme Court affirmed, holding that "questions of fact existed regarding whether the floating platforms were vessels in navigation, and whether Gizoni had sufficient connection to the platforms to qualify for seaman status." 502 U.S. at ——, 112 S.Ct. at 494.

The Supreme Court in *Gizoni*, contrary to Ketzel's contention, did not change the *Wilander* standard that summary judgment is warranted when "the facts and the law will reasonably support only one conclusion." *See Wilander*, 498 U.S. at 356, 111 S.Ct. at 818. Indeed, *Gizoni* cited *Wilander* in setting forth the standard of review, i.e., whether reasonable jurors could differ "as to whether the employee was a [seaman]." *See* 502 U.S. at ——, 112 S.Ct. at 494.

As set forth below, the factors precluding summary judgment in *Gizoni* are clearly distinguishable from those in the instant case. As previously indicated, the platform on which the claimant was riding in Gizoni was actually being used to transport a rudder when the claimant was injured. Again, the caselaw is "heavily skewed" against finding nonvessel status for a craft whose primary mission is to transport "cargo, equipment or passengers over navigable waters." *See Gremillion*, 904 F.2d at 293. The result reached in Gizoni, i.e., that summary judgment was inappropriate, was therefore consistent with—rather than repugnant to—the guidelines set forth by *Gremillion*.

With regards to Ketzel's other contention, caselaw subsequent to *Gizoni* demonstrates that the test in *Gremillion* is not limited to work platforms and serves as a useful tool in determining nonvessel status for *any craft not involved in traditional navigation and commercial activities*. One such case, *Kathriner v. UNISEA, Inc.*, 975 F.2d 657 (9th Cir.1992), was decided by the Ninth Circuit. The claimant there was injured aboard the "Unisea," a boat converted into a floating shrimp processing plant. The claimant sought relief under the Jones Act. Vessel status was disputed, *inter alia*, because of the alterations made to the craft, including a large opening that had been cut into the hull "to allow for dock traffic." *Id.* at 660. The Ninth Circuit granted summary judgment in favor of Unisea, distinguishing its earlier decision in *Gizoni* as follows:

> ... [A]lthough the floating platform [in *Gizoni* had] no independent power, means of steering, navigation lights, navigation aids, or facilities for crew, [it] could nonetheless be a vessel in navigation for pur-

poses of the Jones Act. The platform at issue ... was moved about by tug boats and was powered by external sources. However, we concluded that summary judgment was inappropriate because a reasonable jury could conclude that the platform was a vessel. The facts in *Gizoni*, however, are distinguishable from the facts in the instant case. The platform at issue in *Gizoni* moved over the water and *often transported equipment and ship parts around a dock*. The *transportation function* of the platform made it much more like a vessel *in navigation* than the Unisea.

> While the general rule in Jones Act cases is that the question of whether or not a vessel is involved is typically a jury question, the present case presents a *clearcut answer*. Common sense counsels that we could not reasonably consider the Unisea a vessel under the Jones Act since she is unfit for offshore use ... When she put out to sea, she would surely sink. *Summary judgment is mandated where the facts and the law would support only one conclusion*.

*Id.* at 660 (citation and internal quotation omitted; emphasis added).

The Ninth Circuit, citing a district court case holding that the Unisea was a nonvessel, observed the following:

> Generally, floating structures are not classified as vessels in navigation if they are incapable of independent movement over water, are permanently moored to land, have no transportation function of any kind, and have no ability to navigate.

>    .     .     .     .     .

> The Unisea was converted from a "liberty ship," laid up, withdrawn from service, and relegated to the "mothball fleet." It was extensively modified to become an integral part of a seafoods processing operation. It is connected to shore by spring lines and anchor chains, permanent utility connections, and two access piers. It has not moved in almost three years and defendant has no intention of moving it. In short, the Unisea was neither designed for nor used for navigation or transportation.

It has no navigation or propulsion gear and is not used as a barge. It is nothing more than a floating factory whose only connection with navigation is that it rises and falls with the tide and that it is housed in a "liberty ship" hull.

*Id.* at 660–61 (citation omitted). The Ninth Circuit cited Fifth Circuit precedent, including *Ellender v. Kiva Constr. & Eng'g, Inc.,* 909 F.2d 803 (5th Cir.1990). *See Unisea,* 975 F.2d at 661. In *Ellender,* a platform case, the Fifth Circuit affirmed the district court's granting of summary judgment for the defendants, following the analysis for nonvessel status set forth by *Gremillion. See Ellender,* 909 F.2d at 806.

The *Unisea* court also cited the Fifth Circuit case, *Hayford v. Doussony,* 32 F.2d 605 (5th Cir.1929).[3] *See Unisea,* 975 F.2d at 661. In *Hayford,* the defendants converted the Marietta, a United States gunboat, into "The Pirate Ship," a floating dancing and amusement facility, secured to the dock by cables and clamps. *See* 32 F.2d at 605. The appellees filed suit under admiralty law against the owner for the recovery of wages, seeking to impose a "mariner's lien" on The Pirate Ship. *Id.* The owner challenged the court's jurisdiction under admiralty law. *Id.* The undisputed evidence included the following:

A permanent gangway was built ashore, with a house over it extending to the wharf, the gangplank being secured to the hull with seven or eight one-inch pins. Electric wires and water pipes connected the structure with the shore. The structure was intended by its owner to be used, and was used by him, only as a dance platform permanently secured to the dock at all times when so used, and *at no time was used or intended to be used for transporting freight or passengers.* None of the libelants were employed as mariners or in any way in the capacity of seaman. During the time in 1927 when the Mississippi river was high the Pirate Ship, on the order of the manager of the board of port

commissioners, and over the protest of the appellant, was towed to St. Andrews street wharf, and it was towed to the West End after the seizure in this case.

*Id.* (emphasis added). The trial judge entered a decree against the owner. The *Fifth* Circuit reversed and held as follows:

The Pirate Ship was not used, or intended to be used, to carry freight or passengers from one place to another, and was not an instrument of navigation or commerce, and *performed no function that might not have been performed as well by a floating barge or platform permanently attached to the land.* A result of it not being a vessel or instrument of navigation or commerce engaged in any maritime venture was that a maritime lien did not attach for the compensation for the services rendered by any of the libelants.

*Id.* (emphasis added). The result reached by the Ninth Circuit in *Unisea,* relying in part upon *Hayford* and other highly regarded Fifth Circuit authority, demonstrates that the factors applied in platform cases are relevant to the determination whether the characteristics of the Biloxi Belle fit the pattern of "certain floating structures [that] were not vessels in navigation for purposes of the Jones Act." *Unisea,* 975 F.2d at 662.[4] Further, both *Unisea* and *Hayford* demonstrate that the work platform cases are not distinguishable on the ground that only construction and marine repair was involved.

■ Ketzel argues that, because the Biloxi Belle is floating and "capable of navigation," a reasonable inference is that it is a vessel under the Jones Act, being subject to the hazards of the sea. Ketzel offers as support the undisputed fact that the Biloxi Belle has been towed previously over navigational waters, that it was towed to a safer location during hurricane Andrew in 1992, and that the defendant has a current contract to move the Biloxi Belle should the need arise in the future. Ketzel's argument, grounded in part

---

**3.** The history of *Hayford* is set forth as follows: *The Pirate Ship,* 21 F.2d 231 (D.C.La.1927), reversed by, *Hayford v. Doussony,* 32 F.2d 605 (5th Cir.1929), aff'd, 42 F.2d 439 (1930).

**4.** It follows that, contrary to Ketzel's suggestion, the "family of nonvessels styled as floating work platforms," see *Gremillion,* 904 F.2d at 294, is not a closed class because other structures meeting the same functional attributes may be deemed "nonvessels" as a matter of law.

on nonbinding and nonpersuasive caselaw,[5] is meritless.

The mere fact that a structure is floating or "capab[le] of movement across navigational waters" does not grant "vessel" status. *See Michel v. Total Transp., Inc.*, 957 F.2d 186, 189 (5th Cir.1992); *Bernard v. Binnings Constr. Co.*, 741 F.2d 824, 828 n. 13, 829 (5th Cir.1984); *Blanchard v. Engine & Gas Compressor Servs., Inc.*, 575 F.2d 1140, 1143 (5th Cir.1978). A structure, by virtue of its flotation, is therefore not exposed to the hazards of the sea sufficient to grant "seaman" status. *Id.; see Unisea*, 975 F.2d at 660–61. That a floating structure may be moved periodically because of the dangers of inclement weather is not sufficient to convert its status to a vessel. *See Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926) (cited by *Hayford, supra*) (that converted wharfboat—routinely used as an office and warehouse—was moved each winter to protect it from the ice not determinative of vessel status at time of sinking; addressing ruling on appellants' petition to limit liability under admiralty law).

In *Digiovanni, supra*, cited by *Unisea*, 975 F.2d at 661, the First Circuit, pointing essentially to Fifth Circuit caselaw, *see, e.g., Gremillion*, 904 F.2d at 293; *Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504, 506–07 (11th Cir.1990) (relying on Fifth Circuit opinions); *Ducrepont*, 877 F.2d at 395–96, adopted the Fifth Circuit's "improved" standard that, if a

floating structure's "purpose or primary business is not navigation or commerce, then workers assigned thereto for its shore enterprises are to be considered seaman only when it is in actual navigation or transit." *Digiovanni*, 959 F.2d at 1123.[6] The rationale of such a test is as follows:

> A worker becomes a seaman not by reason of the *physical characteristics* of the structure to which he is attached, but because its being operational "in navigation" exposes him to "a seaman's hazards." He is not exposed by what the vessel did in the past, or by its future potential, and to give him these special benefits by *mechanical definitions* without the *exposure* is misplaced generosity ...

*Id.* (emphasis added). The foregoing "test" is an appropriate rendition of the guidelines set forth by *Gremillion*. *See* 904 F.2d at 293–94.

It is without dispute that, other than being afloat, the Biloxi Belle was stationary and secured to her regular operating location at the time of Ketzel's injury. In a recent case, *Pavone v. Mississippi Riverboat Amusement Corp.*, No. 93–3354, 1994 WL 97820 (E.D.La. March 21, 1994), the Eastern District of Louisiana essentially applied the currently-in-navigation test and concluded that the Biloxi Belle is not a "vessel" under the Jones Act.[7] With regards to its finding of nonvessel status, this Court concurs with the result reached by the *Pavone* court.

---

5. *See McCarthy v. The Bark Peking*, 716 F.2d 130 (2nd Cir.1983) (non-Jones Act case; based on claimant's action under the LHWCA for injuries received while painting the mainmast on ship converted to floating museum), *cert. denied*, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984); *Luna v. Star of India*, 356 F.Supp. 59 (S.D.Cal.1973) (non-Jones Act case; tort claim invoking admiralty jurisdiction in connection with floating maritime museum); *The Showboat*, 47 F.2d 286 (D.Mass.1930) (non-Jones Act case involving attachment of maritime to five-masted schooner used as restaurant and dance hall). The basis for determining vessel status under the LHWCA is not as restrictive as the narrower inquiry under the Jones Act. *See, e.g., Ducrepont v. Baton Rouge Marine Enters., Inc.*, 877 F.2d 393, 395–96 (5th Cir.1989). Arguably, a finding that a craft is a nonvessel under the LHWCA necessarily includes a finding that it is a nonvessel for purposes of the Jones Act.

6. In *Digiovanni*, the First Circuit reversed the jury's finding that the claimant was a seaman under the Jones Act. *See id.* at 1124. The court remanded for retrial on the alternative ground whether the defendant committed simple negligence under the LHWCA. *Id.*

7. In *Pavone*, Judge Beer concluded as follows:

> Applying this test, the Biloxi Belle does not pass muster as a vessel. Perhaps the seriousness with which this matter needs now be addressed speaks most eloquently of how far the courts have unwittingly embolden[ed] and nurtured the myth of the vessel status. For the plain and unvarnished facts of this matter should, on their face, resolve the vessel status issue. Yet, the stilted, end justify the means applications that have wormed their way into the law now require this plodding address. *Id.*

■ Alternatively, Ketzel argues that, because gambling was once limited to "cruise vessels" that were "underway" pursuant to the pre-amendment version of Mississippi Code Annotated § 27–109–1 (West 1990), the defendant "should be bound by the requirements of the Gaming Control Act and the representations it made in obtaining its license under the Act." *See* Pl's. Exh. 6, 7. Ketzel cites no authority to demonstrate that, notwithstanding all other factors relevant to the inquiry, federal courts are empowered to adopt the requirements of a state's licensing statute as a short-cut to determining Jones Act "vessel" status. This Court will entertain no such fiction.

### Conclusion

■ Similar to the "floating factory" in *Unisea* and the "floating dance hall" in *Hayford,* the Biloxi Belle is nothing but a "floating casino." That the Biloxi Belle must be moved across navigational waters in the event of a hurricane is not determinative of the issue whether the structure is a vessel, and thus, whether Ketzel is a seaman under the Jones Act. Indeed, the moving of the structure in the event of a hurricane is incidental to and does not alter the Biloxi Belle's basic purpose as a casino. The physical attachments of the structure to the dock, including relatively permanent utility connections—although not conclusive—lend strong support to a *nonvessel* characterization of the structure.

That the Biloxi Belle *looks like* a ship engaged in transportation of cargo or passengers is not enough. The Biloxi Belle is not equipped, nor does it serve any transportation function whatever. To conclude otherwise would be absurd. Even assuming *arguendo* that the Biloxi Belle is a vessel, which the Court does not decide, it is undisputed that, other than shifting with the rise and fall of the gulf tide, the craft was not moving in navigable waters at the time of Ketzel's injury, nor did it expose Ketzel to the hazards of the sea as defined by the weight of relevant caselaw. This Court finds that, in light of the foregoing analysis, there is but one conclusion as a matter of law: The Biloxi Belle is not a "vessel" under the Jones Act. It follows that the only rational inference available from the undisputed facts is that Ketzel was not a seaman. For reasons set forth above, summary judgment should be granted in favor of the defendant.

Counsel for the defendant shall submit an order in conformity with and incorporating by reference the foregoing Memorandum Opinion within ten (10) days of the date of entry hereof. The parties shall bear their own costs.