Shelley A. HORAK, Administrator of the Estate of Leticia B. Morales, and Antonia Ramona Holguin, Francisco Holguin Morales, and Marc Anthony Abney, Appellees,

v.

ARGOSY GAMING CO. d/b/a Belle Casino of Sioux City, Iowa, Appellant.

No. 99–1941.

Supreme Court of Iowa.

July 17, 2002.

Patrick J. McNulty of Grefe & Sidney, P.L.C., Des Moines, Edward L. Wintroub and Steven Renteria of Wintroub, Rinden, Sens & McCreary, Omaha, Nebraska, for appellant.

John M. Loeschen of Loeschen & Loeschen, Burlington, for appellees.

NEUMAN, Justice.

This is an appeal of the jury's verdict for the plaintiffs in an action brought under our state's dram shop act, Iowa Code section 123.92 (1999). Because the dram shop at issue is a riverboat casino, the principal question on appeal is whether the district court erred when it refused to apply federal admiralty law instead of Iowa statutory law. We conclude that because there is no federal maritime dram shop law, federal preemption principles do not apply and the district court properly instructed the jury to consider the casino's civil liability in accordance with section 123.92.

Although many other errors are cited in the trial of the case, none warrant reversal. We therefore affirm the judgment entered upon the jury's verdict.

## I. Background.

A jury could have found the following facts. Leticia Morales, a thirty-one year old mother of three children, dropped her daughter off at a birthday party. There she met Juan Jurado and Gerardo Graci-

ano. After socializing briefly with the young people, Morales and the two men left the party and headed to the Belle of Sioux City riverboat and gambling casino. The casino is owned by defendant, Argosy Gaming Company.

The record reveals that Morales may have drunk some beer before arriving at the casino, but she was by no means intoxicated. That situation soon changed. While Jurado and Graciano played blackjack, Morales began ordering cocktails and playing the slot machines. Estimates of how many drinks Morales consumed over the next three or four hours varied widely, but witnesses described her as becoming very inebriated. Her loud and obnoxious behavior eventually led security officers to forcibly remove her from the boat. When she attempted to start her car, police were called to the scene. Jurado and Graciano, who had not been drinking, convinced officers to let them get her home. The trio left with Graciano behind the wheel of Morales' car.

What happened in the next hour is the subject of some dispute. Graciano, unfamiliar with operating a manual transmission, quickly stalled Morales' car. He testified that this angered Morales, who demanded that she be allowed to drive and literally kicked him out of the vehicle. He said that Jurado got out of the car as well, and the two walked to his house and then to a nearby convenience store. Jurado, on the other hand, testified that he asked to be dropped off first because he was tired. He said that Graciano joined him within half an hour or so, explaining that Morales had kicked him out of the car and suggesting that they walk to the house where they had first met her to see if she had returned to retrieve her daughter. On the way they stopped at the convenience store.

Upon leaving the convenience store, Jurado and Graciano saw emergency vehicles and Morales' car sitting on its top in the yard of a nearby duplex. An off-duty officer who witnessed the one-car collision testified that he saw the vehicle careening down the street at a high rate of speed. It then missed the turn and flipped over several times, landing against the house. The car's only passenger—Morales—was thrown from the vehicle. She suffered severe injuries in the collision, including a fatal blow to her head.

A forensic toxicologist reported that, at the time of the accident, Morales' blood alcohol count was .250, more than twice the legal limit. She was found some distance from the car, partially wrapped in a blanket. A police investigation determined that the blanket came from a motel room rented that night by Juan Jurado. The motel was located roughly a mile from the scene of the collision.

Suit was brought on behalf of Morales' three minor children by Shelley A. Horak, administrator of the decedent's estate. Plaintiffs brought their petition under Iowa Code section 123.92, alleging that the defendant, Argosy Gaming, sold and served intoxicants to plaintiffs' decedent while she was a patron on defendant's riverboat casino. The defendant answered with a general denial and asserted the affirmative defense that the injuries and damages claimed neither resulted from, nor were proximately caused by, the alleged intoxication of Leticia Morales.

Following trial, the jury returned verdicts finding the defendant liable for the losses sustained by Morales' children, assessing damages for past and future loss of parental consortium as follows: $250,000 for Antonia, $500,000 for Francisco, and $500,000 for Marc. Further facts and procedural events will be detailed as they

pertain to the issues urged by the defendant on appeal.

## II. Issues on Appeal.

### A. State law versus maritime law.

In advance of trial, Argosy filed an application to adjudicate law points which asserted that federal admiralty law applied, preempting the plaintiffs' state dram shop claim. The district court rejected the defendant's assertion, ruling that any decision concerning the applicable law would depend on the facts proved at trial and, even if maritime principles were implicated, Iowa's statutory dram shop act would not be preempted by federal law. The court reaffirmed its conclusion in response to Argosy's motions for directed verdict and judgment notwithstanding the verdict urged on the same ground at trial. We review these rulings for correction of errors at law. Iowa R.App. P. 6.4.

Our analysis begins with the fundamental observation that plaintiffs' suit rests solely on a statutory cause of action. Iowa's Dramshop Act, section 123.92, provides that anyone injured "in person or property or means of support" as a result of the intoxication of another

> has a right of action for all damages actually sustained, severally or jointly, against any licensee or permittee ... who sold and served any beer, wine, or intoxicating liquor to the intoxicated person when the licensee or permittee knew or should have known the person was intoxicated, or who sold to and served the person to a point where the licensee or permittee knew or should have known the person would become intoxicated.

This court has long recognized that the dram shop statute was enacted because, at common law, no cause of action for negligence could be maintained against one who merely sold alcoholic beverages;

as a matter of law, only the drinking of liquor—not the furnishing of it—satisfied the proximate cause element in an action by a third party for damages. *Snyder v. Davenport*, 323 N.W.2d 225, 226 (Iowa 1982); *accord Haafke v. Mitchell*, 347 N.W.2d 381, 384 (Iowa 1984), *overruled on other grounds by Gail v. Clark*, 410 N.W.2d 662 (Iowa 1987). In other words, the statute was "[c]onceived as a means to create liability where none existed at common law." *Slager v. HWA Corp.*, 435 N.W.2d 349, 354 (Iowa 1989). Because the statute's benefits are plainly reserved to "innocent parties," comparative fault principles play no part in the trial of a dramshop case. *Id.* at 356, 358; *accord Jamieson v. Harrison*, 532 N.W.2d 779, 781 (Iowa 1995). And despite subsequent statutory changes and corresponding interpretive commentary by this court, it has remained the rule that "Iowa Code section 123.92 provides the *exclusive* remedy against liquor licensees and permittees for losses related to the furnishing of alcohol to an intoxicated adult." *Summerhays v. Clark*, 509 N.W.2d 748, 750 (Iowa 1993).

Against this backdrop, we consider Argosy's preemption claim. It is undisputed that the casino derives its authority to sell and serve alcoholic beverages from a license issued by the state of Iowa; it is a licensee as that term is used in section 123.92. Yet Argosy contends that the suit between the parties involves a "maritime tort." So, the argument continues, the suit is governed by admiralty law, not Iowa's dramshop statute. For the reasons that follow, we find the argument unpersuasive.

*Maritime law.* Any attempt to articulate a cogent explanation of the relationship between federal maritime law and state substantive law is a daunting task, at best. As even the Supreme Court has observed, "[i]t would be idle to pretend

that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence, or indeed is even entirely consistent *within* our admiralty jurisprudence." *Am. Dredging Co. v. Miller,* 510 U.S. 443, 452, 114 S.Ct. 981, 987, 127 L.Ed.2d 285, 296 (1994) (emphasis added). We begin, then, with the basics.

■ Consistent with Article III of the United States Constitution, Congress has vested federal district courts with "original jurisdiction, exclusive of the courts of the States" in matters of admiralty or maritime jurisdiction, "saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1) (2001). This "saving to suitors" clause effectively grants state courts concurrent jurisdiction in cases grounded in admiralty law. *Keefe v. Bahama Cruise Line, Inc.,* 867 F.2d 1318, 1321 n. 1 (1989), *aff'd,* 902 F.2d 959 (11th Cir.1990); 2 Am.Jur.2d *Admiralty* § 9, at 656 (1996).

■ General "admiralty" or "maritime" law is not codified. It exists as "a species of judge-made federal common law." *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 206, 116 S.Ct. 619, 624, 133 L.Ed.2d 578, 586 (1996). Whether a particular controversy "sounds" in admiralty depends on factors most often discussed in cases where one of the disputants seeks removal from state to federal court or, conversely, dismissal for lack of admiralty jurisdiction. *See, e.g., Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 529–32, 115 S.Ct. 1043, 1046–47, 130 L.Ed.2d 1024, 1032–33 (1995) (admiralty jurisdiction properly invoked to permit dredging company protection under Limitation of Vessel Owner's Liability Act (LVOLA) in action for damages sustained by business owners due to flooding of Chicago River); *Duluth Superior Excursions, Inc. v. Makela,* 623 F.2d 1251, 1251–52, 1254 (8th Cir.1980) (reversing dismissal of federal court action brought by excursion boat to limit potential liability under LVOLA for injuries sustained by passenger following "booze cruise" on Lake Superior). But to meet the test of admiralty jurisdiction, whether invoked in state or federal court,

> a party ... must satisfy conditions both of *location* and of *connection with maritime activity.* A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must "assess the general features of the type of incident involved" to determine whether the incident has "a potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."

*Grubart,* 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035 (citations omitted) (emphasis added).

■ "The exercise of admiralty jurisdiction, however, 'does not result in automatic displacement of state law.'" *Yamaha Motor,* 516 U.S. at 206, 116 S.Ct. at 623, 133 L.Ed.2d at 585 (citation omitted). When exercising concurrent admiralty jurisdiction, state courts are free to adopt remedies fitting the case, so long as the state law does not undermine general maritime principles or unduly interfere with the harmonious and uniform application of maritime law. *Am. Dredging Co.,* 510 U.S. at 447, 114 S.Ct. at 985, 127 L.Ed.2d at 293; *accord Clements v. Gamblers Supply Mgmt. Co.,* 610 N.W.2d 847, 849 (Iowa), *cert. denied, Gamblers Supply Mgmt. Co. v. Clements,* 531 U.S. 873, 121 S.Ct. 175, 148 L.Ed.2d 120 (2000); *see*

*generally* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 48 (2d ed.1975) [hereinafter Gilmore & Black]. Put another way, "where there is a gap in federal maritime law, a state may apply its own law where not inconsistent with federal maritime law." 2 Am.Jur.2d *Admiralty* § 142, at 762; *see Yamaha Motor,* 516 U.S. at 202, 116 S.Ct. at 621–22, 133 L.Ed.2d at 583 (affirming tradition that state remedies apply in maritime wrongful-death cases "in which no federal statute specifies the appropriate remedy and the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade").

Plainly the line marking the contours of this concurrent jurisdiction is not well defined. State court remedies have enjoyed a broad scope, extending to admiralty cases involving state-created liens, remedies for wrongful death and survival actions, the partition and sale of ships, specific performance of arbitration agreements and breach of warranty for maritime insurance. *Am. Dredging Co.,* 510 U.S. at 452, 114 S.Ct. at 987, 127 L.Ed.2d at 296. Yet not all actions grounded in state law have survived federal scrutiny. Notable within this classification are cases sounding in premises liability. In *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 626, 631–32, 79 S.Ct. 406, 407, 410, 3 L.Ed.2d 550, 552, 555 (1959), for example, where the guest of a cruise ship passenger sued the cruise line for injuries sustained in a fall on a stairway of the vessel, the Supreme Court emphatically rejected New York's premises liability law (with its distinctions between licensee and invitee) in favor of the "settled principle of maritime law" that a ship owner owes a duty of reasonable care under the circumstances toward anyone lawfully aboard the vessel. *Kermarec's* "reasonable care under the circumstances" rule appears to have been consistently followed in other negligence actions tried in admiralty. *See, e.g., Keefe,* 867 F.2d at 1322; *Smith v. S. Gulf Marine Co. No. 2,* 791 F.2d 416, 421 (5th Cir.1986); *Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169, 172 (2d Cir.1983).

A review of cases where the federal courts have applied state law in an admiralty context is illuminating. In *Sun Ship, Inc. v. Pennsylvania,* 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980), the Supreme Court upheld a state supreme court decision applying state workers' compensation laws to claims of shipbuilding laborers whose land-based injuries fell within the coverage of the federal Longshoremen's and Harbor Workers' Compensation Act (LHWCA). Rejecting the employer's claim that the LHWCA preempted state law, the Court observed that Congress intended the federal law to supplement, rather than supplant, remedies for workers, particularly where the injury—although maritime in nature—occurred ashore. *Sun Ship,* 447 U.S. at 720, 100 S.Ct. at 2436, 65 L.Ed.2d at 463. More recently, in a negligence case stemming from a fatal jet ski accident off the coast of Puerto Rico, the Court considered the jet ski manufacturer's claim that federal maritime law preempted available state law remedies because the death occurred in navigable waters, thereby limiting the recoverable damages to funeral expenses. *Yamaha Motor,* 516 U.S. at 201–02, 116 S.Ct. at 621–22, 133 L.Ed.2d at 583. The Supreme Court rejected this assertion, observing that Congress "has not prescribed remedies for the wrongful deaths of non-seafarers in territorial waters," so damages available for the jet ski death of plaintiffs' decedent were properly governed by state law. *Id.* at 215–16, 116 S.Ct. at 628–29, 133 L.Ed.2d at 592. The Court expressly limited its decision, however, to the *remedy* available under the

saving to suitors clause. It specifically left open the "source—federal or state—of the standards governing liability, as distinguished from the rules on remedies." *Id.* at 216 n. 14, 116 S.Ct. at 629 n. 14, 133 L.Ed.2d at 592 n. 14.

Pertinent to the case before us, two noted commentators have observed that one consistent theme seems to emerge from these otherwise murky waters:

> Maritime law clearly prevails over inconsistent state law in actions brought under the saving to suitors clause, *at least where the maritime law rule is more favorable to plaintiff's recovery than the state law rule;* it is possible that plaintiff may have the best of both worlds and claim the benefit of a *state law rule that is more favorable to him than the maritime rule would be.*

Black & Gilmore at 279 (emphasis added). This observation is echoed in *Yamaha Motor,* where the Court acknowledged that its 1970 decision in *Moragne v. States Marine Lines, Inc.*—which recognized a maritime cause of action for wrongful death caused by breach of the duty of seaworthiness but left undisturbed a state law claim of negligence—centered on the humanitarian *extension* of relief, not the *contraction* of it. *Yamaha Motor,* 516 U.S. at 213, 116 S.Ct. at 627, 133 L.Ed.2d at 590 (emphasis added) (citing *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 387, 90 S.Ct. 1772, 1781, 26 L.Ed.2d 339, 349 (1970)). Indeed the Court's most recent pronouncement—which extended *Moragne's* reach to a maritime cause of action for wrongful death stemming from negligence as well as unseaworthiness—clarified its view that congressional intent with respect to maritime law tends to preserve state law claims rather than preempt them, at least insofar as nonseamen are concerned. *See Norfolk Shipbuilding & Drydock Corp. v. Garris,*

532 U.S. 811, 819, 121 S.Ct. 1927, 1932–33, 150 L.Ed.2d 34, 42 (2001).

■ *Applying maritime law in the dram shop context.* That brings us back to the question at issue: whether this suit on behalf of Morales' children constitutes a "maritime tort," as Argosy contends, in which admiralty law preempts Iowa's dram shop law. Argosy theorizes that because the plaintiffs could have maintained a maritime negligence action against the casino for Morales' death, they are thereby prevented from grounding their cause of action in a state statute. The plaintiffs counter that, assuming their suit invokes admiralty at all, the lack of a maritime dram shop law necessarily means that application of state law neither undermines general maritime principles nor unduly interferes with the harmonious application of maritime law.

Turning first to the question of admiralty jurisdiction, we conclude that because the statutory harm complained of—the sale and service of alcohol to an intoxicated adult—occurred on a vessel capable of transporting passengers on a navigable waterway, the *Grubart* "location" test for concurrent admiralty jurisdiction is satisfied. *See* Iowa Code § 99F.1(6)–(8), .1(7) (1999) (defining "excursion gambling boat" to mean self-propelled vessel required to cruise away from dock for minimum number of days during excursion season); *cf. Ketzel v. Mississippi Riverboat Amusement Ltd.,* 867 F.Supp. 1260, 1268 (S.D.Miss.1994), *aff'd, Pavone v. Mississippi Riverboat Amusement Corp.,* 52 F.3d 560 (5th Cir.1995) ("floating casino" incapable of serving any transportation function held not a vessel for purposes of invoking admiralty jurisdiction). Moreover, the incident arguably satisfies the two prongs of *Grubart's* "connection" test: the alleged wrong has a "potentially disruptive impact on maritime commerce" and "shows 'a sub-

stantial relationship to traditional maritime activity.'" *Grubart,* 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035 (citation omitted); *see Duluth Superior Excursions,* 623 F.2d at 1252–53 (carrying passengers for hire, supervising their alcohol consumption and providing safe means of disembarking all "related to" traditional maritime activity); *Quinn v. St. Charles Gaming Co.,* 815 So.2d 963, 966 (La.Ct. App.2002) (vessel's alleged failure to supervise passengers' on-board alcohol consumption meets *Grubart's* connection test). *But see Davis v. Players Lake Charles Riverboat, Inc.,* 74 F.Supp.2d 675, 676 (W.D.La.1999) (short trips by riverboat casino over navigable water not substantially related to traditional maritime activity but merely incidental to primary function as gambling facility and "activity which gave rise to the plaintiffs' injury, gaming").

Acknowledging the admiralty character of the case does not resolve the controversy before us, however. The question remains whether, as Argosy contends, maritime law preempts Iowa statutory law. Argosy correctly asserts that ordinary negligence principles have been applied in maritime cases involving intoxicated passengers or crewmembers. *See Reyes v. Vantage Steamship Co.,* 609 F.2d 140, 141–42, 146 (5th Cir.1980) (suit brought by widow of crewman who drowned after unsupervised consumption of large quantity of alcohol aboard "floating dram shop" remanded for comparison of fault between crew member and ship owner); *Guinn v. Commodore Cruise Line, Ltd.,* No. 94 Civ. 5890(TPG), 1997 WL 164290, at *1 (S.D.N.Y. Apr.7, 1997) (court denied summary judgment to cruise ship in negligence action involving passenger's fall in a stairwell, identifying actionable claims for "negligent service of alcoholic beverages, negligent failure to assist [the passenger] when intoxicated, and negligent maintenance of a stairwell"); *Thier v. Lykes*

*Bros., Inc.,* 900 F.Supp. 864, 866, 879 (S.D.Texas 1995) (in action by cadet/crewman for injuries sustained in car crash, ship owner found negligent for "failing to monitor alcohol consumption onboard, fostering a party atmosphere, and failing to prohibit drunk officers from driving"); *see also Bay Casino, L.L.C. v. M/V Royal Empress,* 199 F.R.D. 464, 465, 467 (E.D.N.Y.1999) (permitting intervention in action to limit gambling boat's liability, where interveners asserted boat's negligence in serving alcohol to underage patron who was later involved in auto accident).

We deem it significant, however, that plaintiffs rest their claims, not on ordinary negligence, but on Iowa Code section 123.92, a statutory remedy preserved to innocent third parties who are allegedly injured by the dram shop's sale and service of alcohol to an intoxicated adult. *Slager,* 435 N.W.2d at 351. In comparable cases, federal trial courts have disagreed over whether the foregoing decisions constitute a "maritime dram shop law" that trumps state dram shop laws that either permit, or disallow, actions against purveyors of alcohol. *Compare Meyer v. Carnival Cruise Lines, Inc.,* No. C–93–2383 MHP, 1994 WL 832006, at *4 (N.D.Cal. Dec.29, 1994) (finding no authority supporting claimed federal maritime dram shop law and therefore applying California's dram shop law), *with Young v. Players Lake Charles, L.L.C.,* 47 F.Supp.2d 832, 837 (S.D.Texas 1999) (existing maritime negligence standards govern issue of dram shop liability to exclusion of Louisiana anti-dram shop legislation).

■ In wrestling with this decision, we are guided by the fundamental tenet of preemption doctrine that federal law will not preempt state law "absent a clear statement of congressional intent to occu-

py an entire field" or unless applying state law would conflict with or otherwise frustrate a federal regulatory scheme. *Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 925 (Iowa 1994). Plainly there is no federal maritime statute comparable to Iowa Code section 123.92 governing the rights and liabilities of dram shops or third parties victimized by their patrons. And as the federal trial court in *Meyer* observed, neither is there a consistent or uniform body of maritime common law imposing tort liability on sellers of alcohol for injuries resulting from their sales. *Meyer*, 1994 WL 832006, at *4. As the federal trial court in *Young* rightly observed (while characterizing the maritime common law of negligence as a maritime dram shop law), the problem is that application of some state laws—like the Louisiana anti-dram shop law at issue in *Young*—would leave innocent parties without a remedy for wrongs committed by navigable dram shops. *Young*, 47 F.Supp.2d at 837.[1] But, in Iowa, where the state law remedy available to plaintiffs such as Morales' children proves more generous than relief under general maritime negligence law would be,[2] we are convinced that the "humane and liberal character" of admiralty law described in *Yamaha Motor* compels the application of the more beneficent state law. *Yamaha Motor*, 516 U.S. at 213, 116 S.Ct. at 627, 133 L.Ed.2d at 590. In other words, in the absence of a comprehensive federal scheme with which Iowa's law would conflict, we are convinced plaintiffs were entitled to pursue their state law claim against Argosy under Iowa Code section 123.92.

In truth it would be absurd to hold that Argosy, carrying dram shop insurance and having secured its gaming license as well as its authorization to sell alcoholic beverages on the condition that it comply with Iowa's liquor laws, could circumvent the reach of those laws by claiming federal preemption. Just as in *Clements*, where we wrestled with the preemption question in the context of gambling boat crewmen's claims of wrongful discharge, we perceive no "fundamental tenet of substantive maritime law" frustrated by the application of section 123.92 to the case before us. *Clements*, 610 N.W.2d at 850. The district court was correct in so ruling and, accordingly, we affirm its decision on this point.

**B. Sufficiency of the evidence.** Argosy next argues that plaintiffs tendered insufficient proof on each of the essential elements of their dram shop claim. Thus it contends the court erred by not directing a verdict in Argosy's favor, either at the close of plaintiffs' case or in response to Argosy's motion for judgment notwithstanding the verdict.

On our appellate review of this issue we are obliged, as was the trial court, to view the evidence in the light most favorable to the plaintiffs. *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999). Evidence is substantial if a reasonable person would find it adequate to reach a conclusion. *Id.* To sustain their cause of

---

1. The court said:

   If Louisiana wants to establish shoreside casinos and insulate their liability, that is solely Louisiana's business. But, where navigable ships in Louisiana are going to entice residents of Texas and other states to flock in huge numbers to their casinos to drink too much and return home in a murderous condition, the general maritime law should and does afford the endangered public with a ready and wholly appropriate remedy.

   *Young*, 47 F.Supp.2d at 837.

2. For example, comparative fault principles would not apply to the trial of a case under section 123.92 because the statute's benefits are reserved to "innocent parties." *Slager*, 435 N.W.2d at 356, 358.

action, plaintiffs were required to prove that Argosy, a liquor licensee or permittee, (1) sold and served intoxicating beverages to Leticia Morales when it knew, or should have known, that she was intoxicated or knew, or should have known, that she would become intoxicated from the drinks served, and (2) that as a proximate result of Morales' intoxication, the plaintiffs were injured in their person, property or means of support. Iowa Code § 123.92; *Hobbie-brunken v. G & S Enters., Inc.*, 470 N.W.2d 19, 21 (Iowa 1991).

■ Argosy begins by claiming the record fails to establish that any of its employees actually sold Morales alcoholic beverages or, if they did, that they knew or should have known of her intoxication at the time the drinks were served. The challenge is simply belied by the record made at trial. Morales' companions, Jurado and Graciano, both testified that they saw her ordering drinks from casino waitresses and drinking them. Both stated that she became visibly intoxicated, "hanging" on them, swearing, her breath smelling of alcohol as she became increasingly loud and obnoxious. These observations were echoed by casino personnel. One casino waitress who formerly worked with Morales testified that she encountered her sometime before 1 a.m. and knew that, if asked, she could not have served Morales because of her intoxication. The security personnel who eventually ejected Morales from the boat plainly had no doubt about her inebriated state. Thus, although plaintiffs did not produce at trial the actual server (or servers) of the drinks Morales consumed, the record contained substantial circumstantial evidence that Argosy employees sold and served Morales drinks and knew, or reasonably should have known, of her inebriated state when they did so. *See Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 346 (Iowa 1991) (require-

ment that defendant prove "sale" and "service" may be met by proof that establishment sells liquor and generally holds itself out as place where patrons are " 'served' in the ordinary sense of the word."); *Hobbie-brunken*, 470 N.W.2d at 22 (knowledge element of section 123.92 may be satisfied by subjective or objective proof of dram shop defendant's knowledge).

■ Argosy also contests the sufficiency of proof on the proximate cause element of plaintiffs' claim. To the extent it relies on the lack of "eye witness" testimony putting Morales "for sure" behind the wheel of the car during its fatal crash, the argument carries little, if any, weight. An off-duty police officer happened to witness the crash from beginning to end. He found no proof, as Argosy seems to theorize, that one of Morales' companions may have been driving the car and somehow escaped unscathed. In any event, the question was properly placed before the jury.

■ The same holds true for the causal relationship between Morales' intoxication and the accident. Forensic toxicologist, Michael Rehberg, testified that Morales' blood alcohol count of 0.250 meant that she had consumed roughly seventeen drinks in the five hours preceding her demise. Given her patronage at the casino during that time frame, her level of intoxication, and the proof tendered on how such drinking would impair her ability to drive safely, the court committed no error in refusing to direct a verdict for Argosy.

*C. Evidentiary and instructional issues related to proximate cause.* Argosy also cites evidentiary and instructional error bearing on its defense of the case. It claims the court's rulings skewed the jury's consideration of the proximate cause questions, entitling it to a new trial.

■ *Evidence of Morales' undress.* When off-duty officer Aaron Clark discovered Morales' body thrown from her vehicle following the accident, she was naked from the waist down and wrapped in a blanket. Over Argosy's objection, the district court sustained the plaintiffs' motion to exclude this detail at trial, concluding the matter of Morales' undress was more prejudicial than probative on the proximate cause and damage issues awaiting the jury. The court did, however, permit evidence concerning the blanket and the fact that it matched one missing from Jurado's room at a nearby motel. The record also included the entire police investigative file (with only references to Morales' nakedness blacked out) which included hearsay statements by neighbors concerning commotion and squealing tires heard near the motel just preceding the accident, the fact "a rape kit was done," and speculation that perhaps Morales was fleeing a sexual assault when the accident occurred.

■ Argosy assails the court's limine ruling on appeal, claiming the court prevented it from tendering a crucial piece of evidence supporting its defense that Morales' companions "may have had more to do with this accident than the facts presented to the jury would indicate." The defendant also concedes, as it must, that trial courts are granted broad discretion concerning the admissibility of evidence. *Bangs v. Maple Hills, Ltd.,* 585 N.W.2d 262, 265 (Iowa 1998). That discretion extends, of course, to the balancing of probative value versus prejudice under Iowa Rule of Evidence 5.403. *Johnson v. Knoxville Cmty. Sch. Dist.,* 570 N.W.2d 633, 640 (Iowa 1997). Reversal would be warranted only if the trial court "clearly abused its discretion to the prejudice of the complaining party." *Id.*

Argosy contends the court deprived the jury of a "clear picture leading up to the accident," thereby preventing the jury's fair consideration of its defense that flight from assailants, not intoxication, was the proximate cause of the accident that took Morales' life. When the record is considered as a whole, however, we find no basis for disturbing the court's discretionary ruling. Despite the evidence adduced by Argosy on its "flight" theory of superceding cause, the record contains *no* proof that it was Morales' tires heard squealing in the motel parking lot, that she was ever at the motel, or that she was sexually assaulted or fleeing anyone. The investigating officer admitted at trial that any sexual assault theory was purely speculative. Balanced against this conjecture, the court was obliged to weigh plaintiffs' claim that Argosy's true intent was to sully Morales' character and cast doubt on her maternal conduct in the hope of reducing her children's recovery for her loss. Given these competing considerations, the uncontroverted proof that it was Morales' extreme intoxication that impaired her judgment and ability to drive, and the limited value of the evidence of her undress on that proximate cause question, we find neither abuse by the trial court nor substantial prejudice suffered by Argosy as a result of the court's limine ruling. No ground for reversal appears.

***Proximate cause instructions.*** Argosy contests the jury instructions on two fronts. First it complains the court's affirmative defense instruction (which told the jury to find for Argosy if Morales' intoxication did not contribute to the action that injured the plaintiffs) erroneously placed the burden of proof on the defendant and, second, that the jury must have been confused by the proximate cause language in two other instructions. We find no merit in either contention.

The error, if any, in the court's instruction concerning Argosy's affirmative defense was invited by the defendant and may not now be asserted as a ground for reversal. *Sheets v. Ritt, Ritt & Ritt, Inc.,* 581 N.W.2d 602, 607 (Iowa 1998); *Tilghman v. Chicago & N.W. Ry.,* 253 Iowa 1339, 1350–51, 115 N.W.2d 165, 172 (1962). The instruction given by the court mirrored not only defendant's pleading but was nearly identical to the instruction it proposed before trial. Read in isolation, the jury might have believed—as Argosy argued post-trial and urges on appeal—that it bore the burden of proof regarding Morales' intoxication. But the marshalling instruction placed the burden of proof squarely on the plaintiffs to prove each essential element of their claim. Only if plaintiffs met that burden was the jury then directed to consider Argosy's defense that Morales' intoxication did not contribute to her injurious actions.

Argosy also complains of potential confusion between instruction nine—the marshalling instruction—and number twelve which explained that, to recover, plaintiffs had to prove Morales consumed alcohol sold and served by Argosy. When read together, we think the instruction explained, rather than confused, plaintiffs' dual burden—to prove that Argosy's conduct caused Morales' intoxication and that Morales' intoxication caused plaintiffs' loss—while accommodating Argosy's defense that Morales' intoxication *did not* contribute to her injurious action.

It is sufficient if the instructions, when read as a whole, accurately state the parties' contentions and the pertinent law without misleading the jury. *Waits v. United Fire & Cas. Co.,* 572 N.W.2d 565, 575 (Iowa 1997). Here the court followed the uniform instructions, and the jury simply had to choose which version of the facts, plaintiffs' or defendant's, it believed and apply the law accordingly. No ground for reversal appears.

**D. Damages award.** In its motion for judgment notwithstanding the verdict, Argosy contended the jury's substantial award for the plaintiffs was excessive and without support in the record. On appeal it concedes that "loss of a mother is difficult to measure in money," but argues that here the jury's award bore no relationship to non-economic loss, evincing a verdict based erroneously on passion or prejudice. The district court rejected this contention and, we think, rightly so.

Leticia Morales' children were ages eleven, twelve and fifteen when she met her untimely death. Their testimony at trial was brief but compelling, even as revealed by the cold record on appeal. In their words she was the kind of mother who cheered loudest for their teams at sporting events, brought the best treats to school on birthdays, played with them like a friend, and always lent an attentive ear and loving support in time of trouble. Clearly her excessive partying on the night in question did not accurately reflect her usual devotion as a parent. Plaintiffs' loss of consortium was, by any measure, enormous and will arguably extend into their adulthood. *See Audubon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf R.R.,* 335 N.W.2d 148, 152 (Iowa 1983) (loss of parent's guidance and support may decrease over time but is nevertheless recoverable beyond minority of child).

When a verdict falls within a range reasonably supported by the evidence, it is not the court's role to "interfere with what is primarily a jury question." *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 662 (Iowa 1969). We accord weight to the trial court's judgment in the first instance because it had the opportunity to see and hear the wit-

nesses itself. *Id.* at 660. A verdict should not be set aside unless it is "(1) flagrantly excessive or inadequate; or (2) so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is the result of passion, prejudice or other ulterior motive; or (4) is lacking in evidential support." *Id.* at 659; *accord Lamb v. Newton–Livingston, Inc.,* 551 N.W.2d 333, 337 (Iowa Ct.App.1996). Argosy has not met that test here.

■■■ *E. Consortium damages and life expectancy.* Finally, Argosy urges us to limit plaintiffs' recovery for loss of parental services to their age of majority rather than Morales' life expectancy. It acknowledges that, to do so, we would have to overrule long-established precedent interpreting Iowa Code section 613.15. *See Audubon–Exira,* 335 N.W.2d at 150–51; *Schmitt,* 170 N.W.2d at 665.

We decline Argosy's invitation to overrule *Audubon–Exira* and *Schmitt.* Iowa Code section 613.15 authorizes the recovery of damages for the "value of services and support as … parent … in such sum as the jury deems proper." Thus, in accordance with Uniform Civil Jury Instruction No. 200.20, the court instructed that such damages "are limited in time to the shorter of the child's or Leticia B. Morales' normal life expectancy," established under this record to be 46.71 years. In its damage instruction, the jury was also told to consider other factors bearing on the projected length of Morales' life, including "prior health, habits, occupation and life style." Argosy has not persuaded us that these instructions, or the court's application of our prior decisions, were erroneous or warrant reconsideration.

We have considered all of Argosy's claims, whether discussed herein or not, and find none meriting reversal and retrial of this case. We therefore affirm the judgment entered upon the jury's verdict.

**AFFIRMED.**

All justices concur except CADY, CARTER, and TERNUS, JJ., who dissent.

CADY, Justice (dissenting).

I respectfully dissent.

Although I agree the Iowa Dram Shop Act applies to this case, I would conclude Argosy should be granted a new trial based on the failure of the trial court to permit evidence at trial that Morales was partially nude at the time of the automobile accident.

The fundamental question presented by this evidentiary issue is whether the trial court abused its discretion in finding the disputed evidence was unfairly prejudicial under Iowa Rule of Evidence 5.403. Admittedly, the abuse of discretion standard is broad. Yet, the proper resolution of this question begins by recognizing that there is a strong assumption that relevant evidence is admissible. 2 Clifford S. Fishman, *Jones on Evidence* § 11:10(a), at 283 (7th ed.1994) [hereinafter *Jones on Evidence*]. Under this rule, all relevant evidence is admissible "unless its probative value is 'substantially outweighed' by one or more of the negative factors listed in the rule." *Id.* This legal standard reveals exclusion of relevant evidence to be "an 'extraordinary remedy' that should be used only 'sparingly.' " *Id.* In other words, relevant evidence should normally be admitted at trial.

The disputed evidence was relevant in this case because it went to the very heart of Argosy's defense of superseding cause. The law provides that a wrongdoer may be absolved from liability from wrongdoing when an unforeseeable intervening force occurs after the original wrongdoing that

substantially contributes to the plaintiff's injuries. *See Rieger v. Jacque*, 584 N.W.2d 247, 251 (Iowa 1998). In this case, there was evidence that the harm created by Argosy's wrongdoing was initially abated when Jurado and Graciano assured the police that they would drive Morales home due to her intoxicated condition. More importantly, not only was there evidence that Morales would not have been driving if Jurado and Graciano would have done what they told police they would do, but that she may not have been driving in a frantic and reckless manner without the intervention of some apparent horrifying and frightening force that could only be explained by the evidence that Morales was driving the car naked from the waist down. Without this evidence, the defense of superseding cause was essentially meaningless because there was nothing to show the intervening force exacerbated the original risk of harm created by Argosy. *See id.*

One of the negative factors under rule 5.403 that may cause relevant evidence to be excluded from trial is where "its probative value is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 5.403. However, evidence is not prejudicial simply because it is unfavorable to the plaintiff. "Relevant evidence is inherently prejudicial to the party against whom it is offered, in the sense that it hurts or damages that party's chances of winning the law suit." 2 *Jones on Evidence* § 11:14, at 293. Thus, evidence is unfairly prejudicial "only if it has potential to influence the jury to decide the case improperly or the jury is likely to attribute excessive probative value to it." *Id.* at

294. The trial court apparently believed the evidence would taint Morales' character and consequently give the jury a reason to improperly reduce her children's damages for her loss. The reasoning followed by the trial court, and the majority, properly centers on the potential for the jury to improperly decide the case, but the evidence is far from the type that would override the ability of the jury to properly consider the law and the other evidence in the case. *See id.* It was part of the essential facts of the case.

Courts should not sanitize the evidence of a case so that the complete picture is not presented to the jury under some vague, unsupported belief that the jury would abdicate its responsibility if the actual evidence was presented. There is absolutely nothing to indicate the jury could not use this evidence for the important purpose that it was offered. Moreover, it is an assault on the jury system to withhold it on the basis articulated by the trial court.

The result of this case is contrary to our governing rules of evidence and is an affront to the jury system of justice. It also enlarges the abuse of discretion standard well beyond its intended scope.

CARTER and TERNUS, JJ., join this dissent.